**BOARD OF TRUSTEES, SHEET METAL WORKERS' NATIONAL PENSION FUND, and Board Of Trustees, Sheet Metal Workers Local No. 292 Pension Fund, Plaintiffs,**

v.

**PALLADIUM EQUITY PARTNERS, LLC, Palladium Equity Partners II, LP, Palladium Equity Partners II–A, LP, and Palladium Equity Investors II, LP, Defendants.**

Case No. 08–12586.

United States District Court, E.D. Michigan, Southern Division.

July 14, 2010.

Barbara A. Patek, Craig E. Zucker, Erman, Teicher, Southfield, MI, Brian J. Petruska, Jeffrey S. Swyers, Marc H. Rifkind, Slevin & Hart, Washington, DC, for Plaintiffs.

Debra A. Colby, Richard M. Tuyn, Ogletree, Deakins, Bloomfield Hills, MI, Ron-

ald E. Richman, Schulte, Roth, New York, NY, for Defendants.

*OPINION AND ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND SCHEDULING STATUS CONFERENCE*

DAVID M. LAWSON, District Judge.

Before the Court are the parties' cross-motions for summary judgment. The plaintiffs, who are multi-employer pension plans, seek to impose the withdrawal liability of a group of bankrupt companies that supplied painting services to industrial customers upon three private equity limited partnerships and their common financial advisor under controlled group (statutory) and *alter ego* (common law) theories of liability. The Court heard oral argument on the motions on May 10, 2010 and now finds that fact issues preclude summary judgment for either side. Therefore, the motions for summary judgment will be denied.

## I. Background

### A. Withdrawal liability

The plaintiffs in this case seek to collect millions of dollars of "withdrawal liability" owed by the Haden group of companies under a collective bargaining agreement that benefits the plaintiff pension funds. "Withdrawal liability" is a creature of statute, and finds its source in the Multiemployer Pension Plan Amendments Act (MPPAA), 29 U.S.C. § § 1381–1453, which amended portions of the Employee Retirement Income Security Act of 1974 (ERISA) to increase the financial liability of employers who withdraw from underfunded employee benefit plans. With-drawal liability can arise when an employer participates in and then withdraws from a multi-employer benefit plan through a collective bargaining agreement. "An employer's withdrawal liability is its proportionate share of the plan's unfunded vested benefits, that is, the difference between the present value of vested benefits (benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, 29 U.S.C. § 1053) and the current value of the plan's assets." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 609, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (citing 29 U.S.C. §§ 1381, 1391 and *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 724, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)) (internal quotations omitted).

### B. The Haden companies

The Haden group of companies consists of four defunct entities, all Michigan corporations with their principal places of business in Auburn Hills, Michigan. Haden International Group, Inc. wholly owns Haden, Inc., which in turn wholly owns Haden Schweitzer Corporation, which in turn wholly owns Haden Environmental Corporation. Haden Schweitzer Corporation and Haden Environmental Corporation both dissolved on February 1, 2006 as a result of bankruptcy. Prior to bankruptcy, Haden Schweitzer Corporation and Haden Environmental Corporation were in the business of fabricating and installing paint systems for various automobile and other industrial manufacturers. These companies were signatories to a collective bargaining agreement with Local 292 of the Sheet Metal Workers Union and, upon dissolution on February 1, 2006, became subject to withdrawal liability. Plaintiff National Fund assessed $3,369,584.99 against Haden Schweitzer Corporation. Plaintiff Local Fund assessed $8,286,072.09 in withdrawal liability against Haden Schweitzer Corporation. and $1,533,456.80 against Haden Environmental Corporation. Because of its total control over these subsidiaries, Haden International

Group, Inc. (HIG) was jointly and severally liable for these amounts. Together, the plaintiffs seek a joint and several judgment against all the defendants in this case in excess of $13 million, plus unpaid interest, statutory damages under 29 U.S.C. § 1132(g)(2)(C), attorney's fees, and costs.

### C. The Palladium companies

The plaintiffs allege that the defendants took over the troubled Haden companies before the bankruptcy and as a result are responsible for Haden's withdrawal liability. According to the record presented by the parties, it is undisputed that the four defendants consist of three limited partnerships—Palladium Equity Partners II, L.P. ("PEP II LP"), Palladium Equity Partners II-A, L.P. ("PEP IIA LP"), and Palladium Equity Investors II, L.P. ("PEI II LP")—and one private equity firm—Palladium Equity Partners, L.L.C. ("PEP LLC"), who acted as an advisor to these partnerships. The limited partners of the three limited partnerships do not overlap, but they all share the same single General Partner: Palladium Equity Partners II, LLC ("PEP II LLC"), which is not a party to this case. It is the relationship among these entities, and their collective relationship with the Haden companies, that form the basis of the dispute in this case.

### II. Statutory framework

As mentioned above, to remove incentives for employers to withdraw from financially weak employee benefits plans, Congress amended ERISA in 1980 by enacting the MPPAA, 29 U.S.C. §§ 1381–1453. *See Mason & Dixon Tank Lines, Inc. v. Cent. States, SE & SW Areas Pension Fund,* 852 F.2d 156, 158 (6th Cir. 1988). The MPPAA "requires employers who withdraw, completely or partially, from a multiemployer pension plan to contribute to the plan a proportionate share of the unfunded, vested benefits." *Ibid.* Further, to prevent employers from cir-

cumventing their ERISA and MPPAA obligations by operating through separate entities, the MPPAA amended Title IV of ERISA to provide that members of the so-called common controlled group are held jointly and severally liable for withdrawal payments. *Cent. States Se. & Sw. Areas Pension Fund v. Chatham Props.,* 929 F.2d 260, 263 (6th Cir.1991). Under the controlled group liability provision,

> all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

29 U.S.C. § 1301(b)(1).

■ "To impose withdrawal liability on an organization other than the one obligated to the Fund, two conditions must be satisfied: 1) the organization must be under 'common control' with the obligated organization, and 2) the organization must be a trade or business." *McDougall v. Pioneer Ranch Ltd. P'ship,* 494 F.3d 571, 577 (7th Cir.2007).

Common control is established in one of three ways outlined in the Treasury regulations: through a parent-subsidiary control group, brother-sister control group, or a combined group of trades and businesses under common control. 26 C.F.R. § 1.414(c)–2(a); *Cent. States, Se. & Sw. Areas Pension Fund v. Lloyd L. Sztanyo Trust,* 693 F.Supp. 531, 538 (E.D.Mich. 1988); *see also Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 120 n. 5 (4th Cir.1991) (explaining that although the Pension Benefit Guaranty Corporation is charged with developing regulations for implementing section 1301(b), the PBGC

has not passed regulations on the subject, so courts have resorted to the Treasury Department regulations concerning what constitutes a common controlled group). The only theory the plaintiffs seem to be pursuing in this case is the parent-subsidiary controlled group. According to the Treasury Department regulations,

The term "parent-subsidiary group of trades or businesses under common control" means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if—

(i) A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of § 1.414(c)–4(b)(1), relating to options) by one or more of the other organizations; and

(ii) The common parent organization owns (directly and with the application of § 1.414(c)–4(b)(1), relating to options) a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership interest by such other organizations.

26 C.F.R. § 1.414(c)–2(b).

The operative term "controlling interest" used in the regulations is defined, in the case of a corporation, as "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation." 26 C.F.R. § 1.414(c)–2(b)(2)(i)(A).

It is the plaintiffs' theory that the Palladium entities qualify under the parent-subsidiary regulation as controlling the operation of the Haden companies at the time of the bankruptcy because they owned or controlled more than 80% of the outstanding stock in the Haden companies.

The undisputed facts show that the three limited partnerships, under the guidance of their common advisor PEP LLC, acquired substantial interests in HIG beginning in the summer of 2001. At the time of the bankruptcy in February 2006, the stock ownership distribution of HIG's 4.1 million outstanding shares was:

| | |
|---|---|
| PEP II | 1,842,938.47 shares |
| PEP II–A | 815,481.46 shares |
| PEI II | 341,580.07 shares |
| Kenneth Dargatz | 870,000 shares |

Pls.' Mot. for Sum. J., Ex. 21 (Defs.' Response to Pls.' Request for Admission No. 9) at 12.

Kenneth Dargatz was the president and CFO of HIG, and his ability to sell his shares was restricted. The parties agree that Treasury regulations exclude his shares from calculation of ownership. *See* 26 C.F.R. § 1.414(c)–3(b)(5) (which deems as not outstanding the stock of the subsidiary organization owned by an employee of that subsidiary organization if "such stock is subject to conditions which substantially restrict or limit the employee's right ... to dispose of such interest or such stock and which run in favor of the parent or subsidiary organization"). Excluding Dargatz's shares, the total number of outstanding shares at that time was 3.23 million, of which the Palladium entities owned a combined total of 3 million shares—over the 80% benchmark. Individually, however, none of the entities separately owned over 80% of the HIG shares. (PEP II, which owned the most, held 57%). Consequently, for the plaintiffs to prevail on their statutory theory, they must show that the Palladium entities comprised a joint venture or partnership in their ownership and operation of HIG. The plaintiffs argue that the undisputed facts establish exactly that.

The defendants insist that the Palladium LPs operated independently and did not form a joint venture or partnership either in fact or in law with respect to the opera-

tion of HIG. They maintain that the LPs were merely passive investors. Following that argument, they also contend that neither individually nor as a group did the LPs constitute a "trade or business" as the regulations require for controlled group liability. And they argue that the undisputed facts establish their position.

The defendants seek summary judgment as to all four counts of the amended complaint, which assert controlled group and *alter ego* liability by the national fund and the local fund against the four defendants. The plaintiffs seek summary judgment against the defendants on the controlled group counts only.

### III. Summary judgment standard

■ The standards for evaluating a motion for summary judgment are well known but bear repeating here. As the Sixth Circuit recently explained:

Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed.R.Civ.P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002). Once that occurs, the party opposing the motion then may

not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

*Alexander v. CareSource,* 576 F.3d 551, 557–58 (6th Cir.2009). In addition, when " 'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party.... Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party.' " *Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe,* 410 F.3d 810, 817 (6th Cir.2005) (citations omitted)); *see also Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir.2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.' ") (quoting *PDV Midwest Refining, LLC v. Armada Oil & Gas Co.,* 305 F.3d 498, 505 (6th Cir.2002)).

■ The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir.2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized standards when deciding such cross motions: it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506 (6th Cir.2003).

### A. Statutory liability theory

#### 1. Joint venture/partnership

The Treasury regulations expressly state that a partnership qualifies as a trade or business for the purposes of assessing controlled group liability. *See* 26 C.F.R. § 1.414(c)–2(a) ("For purposes of this section and §§ 1.414(c)–3 and 1.414(c)–4, the term 'organization' means a sole proprietorship, a partnership (as defined in section 7701(a)(2)), a trust, an estate, or a corporation."). Section 7701(a)(2) of the Internal Revenue Code, in turn, defines the term "partnership" as follows:

> The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

26 U.S.C. § 7701(a)(2).

In interpreting section 7701(a)(2), the Supreme Court noted:

> A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their agreement, considered as a whole, and by their conduct in execution of its provisions. We see no reason why this general rule should not apply in tax cases where the government challenges the existence of a partnership for tax purposes.

*Comm'r of Internal Rev. v. Tower*, 327 U.S. 280, 286–87, 66 S.Ct. 532, 90 L.Ed. 670 (1946) (internal quotation marks and citations omitted).

██ A joint venture is included within the definition of a partnership under section 7701(a)(2). "The elements of a joint venture are: (a) A contract (express or implied) showing that it was the intent of the parties that a business venture be established; (b) an agreement for joint control and proprietorship; (c) a contribution of money, property, and/or services by the prospective joint venturers; and (d) a sharing of profits, but not necessarily of losses (although some jurisdictions require that there be a sharing of losses)." *Podell v. Comm'r of Internal Rev.*, 55 T.C. 429, 431, 1970 WL 2303 (1970); *see also Ballou v. United States*, 370 F.2d 659, 674 (6th Cir.1966) ("controlling consideration is whether the parties intend to join in a business venture"). The concept of a joint venture is similar to the concept of a partnership, with a primary distinction being that "a joint venture is generally established for a single business venture (even though the business of managing the venture to a successful conclusion may continue for a number of years) while a partnership is formed to carry on a business for profit over a long period of time." *Podell*, 55 T.C. at 432.

The record in this case does not clearly establish whether the Palladium entities acted as a joint venture or partnership concerning their portfolio companies, including HIG. It is uncontested that the three limited partnerships were established in separate limited partnership agreements executed on February 24, 2000 (for PEP II LP and PEI II LP) and May 23, 2000 (for PEP II–A LP) on substantially similar terms. The agreements

declared that the purpose of each partnership was to "make investments in accordance with the Investment Guidelines," Defs.' Mot. for Sum. J., Exs. 1–3 (PEP LP Agrs.) § 2.4, which envisioned "invest[ing] in underperforming companies that are in transition and require a new financial or operational strategy." Defs.' Mot. for Sum. J., Exs. 1–3 (Investment Guidelines, Annex B to PEP LP Agrs.) at 1. The strategy of each LP was "to make equity and equity-related investments in connection with the acquisition of a controlling interest in companies (although it may also take significant minority stakes)." *Ibid.*

Section 4.2 of each limited partnership agreement vested the General Partner of these three partnerships—PEP II LLC, who is not a party to this case—with authority to manage investments of the three LPs and to act as their agent. All three limited partnership agreements entered into virtually identical advisory agreements with a single entity: PEP LLC, a large New York private equity firm and the fourth defendant in this case. Although PEP LLC did not engage in any investment activities itself, it functioned as the brain for the investment operations of the three LPs. Under the advisory agreements with each limited partnership, the role of PEP LLC was to

(i) originate, recommend, structure and identify sources of capital for investment opportunities to the Partnership, (ii) monitor, evaluate and make recommendations regarding the timing and manner of disposition of Portfolio Investments and (iii) provide such other services related thereto for the Partnership as the Partnership may reasonably request, and the Advisor desires to render such services to the Partnership in consideration of an advisory fee and other compensation.

Defs.' Mot. for Sum. J., Exs. 1–3 (Advisory Agr. Annex C to PEP LP Agrs.), at 1.

Once the advisor recommended a certain investment, the General Partner would send out capital call notices to each limited partner in each of the partnerships, and if the limited partners responded to the capital call, the money would be wired directly to the respective portfolio company.

The advisory agreements described the separate identity of each limited partnership and stated expressly that they are "not intended to create, and do[ ] not create, a partnership, joint venture or any like relationship among the parties hereto (or any other parties)." *Id.* at 5, § 7(e). However, section 2.10 of each limited partnership agreement gave General Partner PEP II LLC authority to set up "parallel funds," by which investments of the three LPs were coordinated. For example, this provision in the limited partnership agreement establishing PEP II LP reads:

... the General Partner may create parallel investment entities ("Parallel Funds"), which will invest proportionately (based upon available capital) in all Portfolio Investments on effectively the same terms and conditions as the Partnership ...; provided, that the formation of any Parallel Fund and the issuance of any interest therein shall occur not later than 180 days after the Closing Date.

Defs.' Mot. for Sum. J., Ex. 1 (PEP II LP Agr.), ¶ 2.10(a), at 18–19. That provision meant that "PEP II and PEI II are parallel funds with PEP II–A ... [and] will invest proportionately based upon available capital." Pls.' Mot. for Sum. J., Ex. 4 (Reymond dep.) at 141–42.

Despite many similarities, the respective limited partnership agreements had a few differences. For example, the defendants emphasize that, since partnerships had different limited partners, the "General Partner ha[d] separate fiduciary obligations to each of the Private Equity Funds." Defs.'

Mot. for Sum. J., Ex. 12 (Adams Report) at ¶ 19; *see also* Defs.' Response to Pls.' Mot. for Sum. J., Ex. 1 (Rodriguez dep.) at 51. Additionally, the agreement for PEP II–A LP included a few provisions favoring its single limited partner, the likes of which were absent from the other two agreements. *See* Defs.' Mot. for Sum. J., Ex. 2 (PEP II–A LPA) § 3.4(g)(iv), at 35 & 3.5(f), at 37; *see also* Defs.' Response to Pls.' Mot. for Sum. J., Ex. 1 (Rodriguez dep.) at 51.

The partnerships filed separate tax returns and maintained separate books and records. When the Haden Companies filed for bankruptcy in November 2006, the partnerships declared respective losses on their separate tax returns: PEP II LP realized a loss of $27.6 million, PEP II–A LP lost $12.2 million, and PEI II LP realized a loss of $5.1 million. Yet, the partnerships had no equipment, employees, or customers of their own. The defendants maintain that the only activity at the three limited partnerships was to answer or not answer capital calls.

Despite some formalities emphasizing their separate existence, there were many things the LPs had in common. For example, the partnerships' common advisor, PEP LLC, held a single annual meeting for all investors of the limited partnerships. The limited partnerships also shared an Advisory Committee, which included representatives from all three LPs, among other members, whose task was to approve valuations of the portfolio investments and waive a twenty-five percent divestiture limit. PEP LLC informally referred to the three limited partnerships collectively as "Fund II" and consistently used that term in its annual reports. And when the bankruptcy trustee forwarded money to the three LPs, he did so in a single check.

"Fund II" also referred to the three LPs' investments in other portfolio companies recommended to them by PEP LLC (there were at least six of such companies). The Palladium LPs did not have the *exclusive* right to invest in PEP LLC-endorsed portfolio companies; other funds associated with PEP LLC or its successors were also permitted to purchase stock in such companies at the same time. Despite issuing unitary annual reports for "Fund II," PEP LLC broke down each partnership's respective interests in various portfolio companies and appended each partnership's respective audited financial statements to the annual reports. For example, the 2004 annual report summarized that Fund II obtained a total of $231 million in capital from its investors. Of that amount, approximately 61 percent (or $142 million) came from PEP II LP, 27 percent (or $62.75 million) came from PEP II–A, and 12 percent (or $26.25 million) came from PEI II. Pls.' Mot. for Sum. J., Ex. 14 (2004 Annual Report) at 5. There is some evidence in the record suggesting that a ratio of 62/27/11 was used to "invest pro rata in everything," Pls.' Mot. for Sum. J., Ex. 3 (Rodriguez dep.) at 116, and to determine each limited partnership's percentage of the $35–million-dollar line of credit that Palladium extended to Haden Schweitzer, *see* Pls.' Mot. for Sum. J., Ex. 23 (Am. & Rest. Loan Agr.), Sch. 2.1, at D0043508 (61.43% for PEP II, 27.18% for PEP II–A, and 11.39% for PEI II), and was used in the draft indemnification agreement of Haden's Chief Restructuring Officer John Criso that was never finalized.

With respect to the acquisition of the interests in the Haden companies, the three LPs purchased on August 1, 2001 the total of three million shares of HIG stock for $40 million on the advice of their common advisor, PEP LLC. On the same day, PEP II wired to HIG $1,842,938.47 from its bank account; PEI II wired $341,580.07 from its own bank account;

and PEP II–A wired $815,481.46, likewise from its separate bank account. PEP II, PEI II, and PEP II–A were issued separate stock certificates for, respectively, 1,842,938.47, 341,580.07, and 815,481.46 shares of HIG stock.

On the same day, the limited partnerships signed separate promissory notes with Haden Schweitzer, under which they extended credit to Haden Schweitzer and the latter agreed to repay approximately $16.5 million to PEP II LP, $7.3 million to PEP II–A LP, and $3 million to PEI II LP. Despite the separate wire transfers and separate stock certificates, the three LPs entered into a single Securities Purchase Agreement with Haden, signed on their behalf by their General Partner PEP II LLC. The same is true with regard to the Shareholders and Registration Rights Agreement, which was also executed on behalf of all three of the LPs by PEP II LLC. The Shareholders and Registration Rights Agreement among HIG, Haden Group, LLC, and the three LPs stated, however, that the agreement does not give rise to a partnership between the parties thereto.

As one might expect, with the large infusion of cash came control over the Haden companies by the Palladium entities. By acquiring the majority of Haden shares, the Palladium LPs became entitled to elect five of the seven directors on HIG's Board. They filled these spots with Marcos Rodriguez, Walter Loh, Kevin Reymond (all three members and employees of LPs' advisor PEP LLC) and two PEP LLC executives (but not employees— i.e., they were not compensated by PEP LLC) with experience in the auto industry—Dennis Pawley and William Smith. The remaining Board seats went to HIG CEO Kenneth Dargatz and HIG CFO Bruce Potts. Rodriguez took a leadership role on the Board: he chaired the meetings, set the agenda, and other members of the Board generally deferred to him, according to Dargatz. Rodriguez was also a managing member of PEP II LLC, the LPs' general partner, and was named as the "Key Executive" in each of the respective limited partnership agreements. Rodriguez was also the founder and managing director of PEP LLC.

The Palladium entities used a "hands-on operating and financial approach" to their Portfolio Companies, although their involvement on the financial side was much more pervasive than on the operations side. The point was "to bring financial expertise to these [troubled] companies" and "to bring resources to bear in finance and operations." Pls.' Mot. for Sum. J., Ex. 4 (Reymond dep.) at 199– 200; Pls.' Mot. for Sum. J., Ex. 6 (Dargatz dep.) at 41. "[F]or certain periods of time [the Palladium team] were intimately involved in things that were going on at Haden." Pls.' Mot. for Sum. J., Ex. 5 (Green dep.) at 111. Consistent with this approach, four months after initial investment in Haden the HIG Board of Directors established a four-member HIG Finance Committee, which was granted exclusive authority to review and approve bids, monitor and adjust overhead (including headcount), and approve capital budgets and unbudgeted expenditures. The committee was created at the initiative of PEP LLC and was staffed with HIG's CFO Bruce Potts, two PEP LLC employees who were on HIG's Board, Walter Loh and Kevin Reymond, and PEP LLC executive William Smith.

The Board also established an Office of the President consisting of Dennis Pawley and William Smith, whose task was to provide guidance to HIG CEO Kenneth Dargatz and HIG CFO Bruce Potts on the operations side. Another committee established by the Board was the Audit Committee, which was charged with re-

viewing and approving the Haden Corporations' financial statements and selecting their independent auditors. The Audit Committee consisted of Kevin Reymond, Walter Loh, and William Smith, all employees of PEP LLC; the Committee had no Haden members.

There also is conflicting testimony about the extent of Palladium's involvement in other Haden's matters. For example, HIG CEO and President Kenneth Dargatz testified that the Palladium entities became involved in Haden's manpower issues, pension and benefits decisions, and retention and remuneration issues. Justin Green, an employee of PEP LLC, confirmed that he was at times responsible for overseeing the implementation of head count reductions. PEP LLC also hired, over Dargatz's objections, Rodriguez's protégé John Criso as a Chief Restructuring Officer and Chief Operating Officer at Haden. According to Dargatz, it was not uncommon for Rodriguez to be present in Haden's office in Auburn Hills. And on several occasions, PEP LLC communicated directly with the Haden companies' existing and potential customers. PEP LLC Pawley and Smith even personally met with key personnel at Haden's major customers—DaimlerChrysler, Toyota, and Peugeot.

On the other hand, it was the Haden Corporations' management, consisting of Dargatz and Potts, who decided which employees would be terminated pursuant to the Board's decision to reduce the workforce. Nor did PEP LLC deal with the Haden Corporations' collective bargaining agreements or grievances with their employees' union. Finally, Haden's CFO Bruce Potts testified that he "can't say [he] saw much involvement from Palladium on HR issues," on "pension and benefit issues, ... performance evaluation, retention and remuneration issues." *See* Defs.'

Mot. for Sum. J., Ex. 29 (Potts dep.) at 48–49.

■ These facts create issues that cannot be resolved at the summary judgment stage. The LP agreements—which decidedly disclaim any joint relationship among the three Palladium units—are not themselves dispositive on the issue under IRC section 7701(a)(2). As the Ninth Circuit cogently explained:

To determine whether a partnership has been formed, the court does not look simply to the stated intent of the parties; rather, it analyzes the terms of their agreement and their conduct. *See Luna v. Commissioner*, 42 T.C. 1067, 1077–78, 1964 WL 1259 (1964); *Madison Gas & Elec. Co. v. Commissioner*, 633 F.2d 512, 514 (7th Cir.1980) ("The arrangement is, of course, not taken out of this classification [as a partnership] simply because the three utilities intended to be taxed only as a co-tenancy and not as a partnership.").

A partnership for federal tax purposes is "broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships." 26 C.F.R. § 1.761–1(a); *see also McManus v. Commissioner*, 583 F.2d 443, 447 (9th Cir.1978). It does not matter whether state law classifies a venture as a partnership. *Estate of Kahn v. Commissioner*, 499 F.2d 1186, 1189 (2d Cir.1974).

For federal tax purposes, the Supreme Court has described a partnership as "an organization for the production of income to which each partner contributes one or both of the ingredients of income—capital or services." [*Comm'r of Internal Rev. v.*] *Culbertson*, 337 U.S. [733, 740, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949)]; *see also Bussing* [*v. Comm'r of Internal Rev.*] 88 T.C. [449, 460, 1987 WL 49277 (1987)] ("A partner-

ship for Federal income tax purposes is formed when the parties to a venture join together capital or services with the intent of conducting a business or enterprise and of sharing the profits and/or losses of the venture."). In determining whether parties intended to conduct an enterprise jointly, the Court in *Culbertson* looked to "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent." *Culbertson*, 337 U.S. at 742, 69 S.Ct. 1210. And in *Luna*, the Tax Court identified other factors that bear on whether a venture is a partnership for tax purposes:

> whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

42 T.C. at 1078.

*Bergford v. Comm'r of Internal Rev.*, 12 F.3d 166, 168–69 (9th Cir.1993); *see also Cobb v. Comm'r of Internal Rev.*, 185 F.2d 255, 258–59 (6th Cir.1950) ("The ultimate question is whether the partnership is real,

and the contribution of capital or services are but elements in the determination of its realty [sic].").

The Court must conclude that there exists a genuine issue of material fact as to whether the three LPs constituted a partnership or a joint venture. On one hand, there is no direct evidence of written or oral agreements between the LPs to "join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business" and to share "in the profits and losses." *Tower*, 327 U.S. at 286–87, 66 S.Ct. 532. As noted above, the LPs are governed by separate limited partnership agreements, have separate Advisory Agreements with PEP LLC, and had different limited partners. They purchased separate stock in Portfolio Companies through individual (although parallel) transactions from separate accounts without actually pooling their money together. Under the limited partnership agreements, none of the LPs could bind or act as an agent for the other LPs. Under the cases interpreting the Internal Revenue Code, the express disclaimer of the intent to create a partnership or a joint venture undermines the taxpayer's goal to establish a partnership or a joint venture. *See Ragland Inv. Co. v. Comm'r of Internal Rev.*, 52 T.C. 867, 878–79, 1969 WL 1672 (1969) (deciding not to "recast[ ]" agreement between the parties with conflicting tax interests which set forth duties and obligations "which conform to the business or economic realities of the situation"). *But see United States ex rel. Perler v. Papandon*, 331 F.3d 52, 55 (2d Cir.2003) (stating that "[i]ndividuals may constitute a partnership for tax purposes even though they expressly disclaim an intention to enter into a partnership relation") (citation omitted).

On the other hand, the partnerships shared their single general partner PEP II

LLC and a financial advisor PEP LLP, who wielded a significant amount of power over the LPs' decisions. The general partner was authorized to act as the agent for all three of the limited partnerships and had authority to set up "parallel" investment entities. In fact, in its capacity as an agent for all three of the limited partnerships, PEP II LLC entered into a single Securities Purchase Agreement for the purchase of HIG stock. Also in its capacity as an agent of the three LPs, PEP II LLC entered into the Amended and Restated Loan Agreement with Haden Schweitzer Corporation, under the terms of which the three LPs extended to the company a $35 million line-of-credit in proportions that tracked their share of their respective investments into the company. PEP II LLC prepared unitary annual reports for the three LPs, referring to them collectively as "Fund II." It is also significant that the three LPs invested and yielded profits in approximately the same proportions compared to one another: 61.5/27.2/11.3. The variance in the proportions did not vary by more than .18%.

These facts preclude determination of the issue of the joint venture or partnership as a matter of law.

### 2. Trade or business

■ To constitute a partnership within the meaning of IRC section 7701(a)(2), the entity must be created "for the purpose of carrying on a trade, profession, or business." *See Tower*, 327 U.S. at 286, 66 S.Ct. 532; *McDougall*, 494 F.3d at 577. The defendants' mantra throughout this litigation has been that passive investment does not amount to a "trade or business," and they are merely passive investors. The Court agrees with half of that proposition.

Although the term "trade or business" is not defined in ERISA or MPPAA, courts have used the two-prong test outlined by the Supreme Court in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987), which interprets IRC section 162 dealing with deduction of business expenses. *See Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 642 (7th Cir.2001) (discussing the *Groetzinger* test); *Connors v. Incoal, Inc.*, 995 F.2d 245, 250–51 (D.C.Cir.1993) (characterizing the *Groetzinger* test as "the most authoritative pronouncement available" in the MPPAA context). The *Groetzinger* test states that a person's activity constitutes a "trade or business" when he engages in an activity (1) for the primary purpose of income or profit; and (2) with continuity and regularity. 480 U.S. at 35, 107 S.Ct. 980. The case emphasizes that a thorough examination of particular facts of each case is necessary to determine whether an entity constitutes a "trade or business." *Groetzinger*, 480 U.S. at 36, 107 S.Ct. 980.

*Groetzinger* itself involved an attempt by a full-time gambler who attempted to deduct the expenses he incurred when wagering for his own account to produce income. The Court emphasized that "not every income-producing and profit-making endeavor constitutes a trade or business.... A sporadic activity, a hobby, or an amusement diversion does not qualify." *Groetzinger*, 480 U.S. at 35, 107 S.Ct. 980. That case was consistent with another decision interpreting the same Code section, *Whipple v. Comm'r of Internal Rev.*, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), which denied business deductions to a taxpayer who furnished services to a series of corporations in the hopes of yielding higher returns on his investments. The Court explained, "[w]hen the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his ser-

vices, legally arises not from his own trade or business but from that of the corporation." *Id.* at 202, 83 S.Ct. 1168.

The many courts agree that an entity does not normally conduct a trade or business with sufficient continuity and regularity to satisfy the second prong of the *Groetzinger* test if it merely holds a passive investment interest in some property. *See, e.g., Serv. Bolt & Nut Co. v. Comm'r of Internal Rev.,* 724 F.2d 519, 522 (6th Cir.1983) ("a limited partnership interest is a passive investment that does not permit the trust to actively engage in the management, operation or control of the partnership" and therefore, it is not a "trade or business" under the Internal Revenue Code); *Dietrick v. Comm'r of Internal Rev.,* 881 F.2d 336, 338–39 (6th Cir.1989) (stating that passive investment activity is not "trade or business" for the purposes of an Internal Revenue Code provision allowing the deduction of expenses incurred in carrying on a trade or business); *Cent. States, SE & SW Areas Pension Fund v. Fulkerson,* 238 F.3d 891, 895 (7th Cir.2001) (stating that "possession of a property, be it stocks, commodities, leases, or something else, without more[,] is the hallmark of an investment" and rejecting the claim that merely holding leases was a sufficiently continuous and regular business activity to satisfy the second prong of the *Groetzinger* test). At least one court however has rejected the idea that a passive investment can never qualify as a "trade or business" under the MPPAA. *See Bd. of Trustees of W. Conference of Teamsters Pension Trust Fund v. Lafrenz,* 837 F.2d 892, 894 (9th Cir.1988) (noting that the statute does not distinguish between active and passive investors and finding a proprietorship that leased the trucks to the commonly controlled corporation to be a "trade or business" under section 1301(b)(1)).

The plaintiffs rely heavily on an opinion of the Pension Benefit Guaranty Corporation Appeals Board ("PBGC") issued on September 26, 2007 in which the Board held a private equity fund liable for the underfunded liabilities of a pension plan sponsored by one of its portfolio companies. App'x to Pls.' Mot. for Sum. J., Ex. A [dkt. # 90] (PBGC Appeals Board Opinion). The PBGC concluded that the private equity fund satisfied the first prong of the *Groetzinger* test because (a) the general partner of the fund and various independent institutional investors created the fund for the express purpose of "creating and realizing long-term capital gains primarily from investments ... including ... the general buying, selling, holding, and otherwise investing in securities of every kind and nature"; (b) the fund reported on partnership tax returns that its principal business activity was "investment advisory" and its principal service was "investment services"; and (c) the general partner of the fund received compensation for its investment advisory and management services, including consulting fees, management fees, and carried interest. When considering the second prong of the *Groetzinger* test, the PBGC found significant the size of the fund's overall portfolio (almost $470 million) and the profits generated as a result of the fund's investments ($207,203 in total investment income reported, as well as over $7 million in management fees). The PBGC distinguished the *Whipple* line of cases based on active involvement of the Fund in the activities of the portfolio company and on *Whipple's* focus on personal investments. The Board noted that *Higgins v. Comm'r of Internal Rev.,* 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941), and *Whipple* "refer to individuals managing their own personal investments rather than to partnerships, like the Fund, whose purpose is to acquire, hold, and sell securities and other investment

interests in United States industrial businesses...." Op. at 12. The Board continued:

The Fund, unlike the taxpayer in *Higgins,* is not: (1) an individual acting on his own behalf; (2) merely keeping records and collecting dividends and interest from investments; and (3) solely receiving a return as an [sic] passive investor. Instead, the Fund is a "trade or business" because it regularly is involved in investment activities of a much more active nature than those in *Higgins.* This is reflected in the responsibilities of its agent ... who: (i) provides investment advisory and management services to others (i.e., its partners); (ii) hires a third-party ... to assist in selecting and purchasing potential investments (e.g., the Other Companies) and in distributing the net profits and losses from these companies to itself and limited partners; and (iii) receive compensation for such services (e.g., 20% of all realized profits from the Fund's investments).

. . .

The facts in *Whipple* are distinguishable because the Fund, as evidenced by its tax returns and Partnership Agreement, was directly and substantially involved in a recognized business activity (i.e., providing investment advisory and management services) for the benefit of several other entities (i.e., its general and limited partners).... Furthermore, in contrast to the taxpayer in *Whipple,* ... the Fund's agent was entitled to compensation for investment advisory and management services it performed.

*Id.* at 12–13.

■ The parties dispute the degree of deference the Court ought to pay to the opinion of the PBGC. That body is charged with interpreting the MPPAA and is "entitled to substantial deference when it construes the statute." *Cent. States, Se. &*

*Sw. Areas Pension Fund v. Nitehawk Express, Inc.,* 223 F.3d 483, 491 (7th Cir. 2000); *see also* 29 U.S.C. § 1301(a)(14)(B) ("the determination of whether two or more persons are under 'common control' shall be made under regulations of the [Pension Benefit Guaranty] corporation which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of Title 26"). However, "PBGC opinion letters are not as authoritative as PBGC regulations, but they have been discussed in the same vein as revenue rulings." *Nitehawk Express, Inc.,* 223 F.3d at 491. In this circuit, revenue rulings are "not entitled to the deference accorded a ... Treasury Regulation," *Threlkeld v. Comm'r of Internal Rev.,* 848 F.2d 81, 84 (6th Cir. 1988); they are merely persuasive authority. *Costantino v. TRW, Inc.,* 13 F.3d 969, 980–81 (6th Cir.1994). "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the 'power to persuade,' *ibid.*" *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

■ The Court finds the PBGC's reasoning persuasive, and it remains faithful to the general rule that no matter how large an investor's portfolio or how much managerial attention an investor pays to his investments, investing alone does not constitute a "trade or business." *Higgins v. Comm'r of Internal Rev.,* 312 U.S. 212, 218, 61 S.Ct. 475, 85 L.Ed. 783 (1941). Rather, the approach coins an "investment plus" standard, which the facts in this case, taken in the light most favorable to the plaintiffs, tend to support. There is evidence in the record that Fund II, con-

sisting of the three LPs led by PEP LLC, had a business purpose other than mere investment. The three LPs joined their investments to exert power over financial and managerial activities of Haden. *See* Defs.' Mot. for Sum. J., Exs. 1–3 (Investment Guidelines, Annex B to PEP LP Agrs.), at 1 (describing the purpose of the partnerships to "make equity ... investments in connection with the acquisition of a controlling interest in companies"). Collectively, the three LPs were able to select five of the seven members of Haden's board and set up several committees to control internal operations of the company. The three LPs also purchased the rights to Haden Schweitzer's senior credit facility and became a major source of credit to the Haden corporations. These practices were consistent with the overall functional model for private equity funds, which, according to the defendants' expert Steven M. Adams,

> aggregat[e] capital with a long term investment horizon (typically four to eight years) with the involvement of a team of experienced and professional financial experts ("Private Equity Managers"). In this model, value is created by investing in relatively large, often controlling, percentages of the stock of an enterprise. Thus, the Private Equity Manager achieves some degree of governance control and ability to influence the management of the corporation in which it has invested. This can be done by assuming seats on the board of directors and by frequent communication with the officers of the company. Often, the economic incentives of the shareholders and management are aligned by compensating management in the same currency held by the shareholders—stock in the company.

Defs.' Mot. for Sum. J., Ex. 12 (Adams Report) at ¶ 16. That satisfies the first prong of the *Groetzinger* test.

In addition, the consistent involvement of the private equity funds in the management of the portfolio company meets the second prong of the *Groetzinger* test. As Adams further stated,

> the typical characteristics of the private equity form of investing [are that e]xperienced, professional fund managers make relatively large and non-diversified investments where they intend to own the companies for a long period of time, typically several years, and *intend to exert an active influence over the management and affairs of the company.* This consistency and activism of ownership allows the Private Equity Fund to create value by improving the operations, practices, financial conditions, capital structure and governance of the corporation in which it has a controlling shareholding or shares a controlling shareholding (a "Portfolio Company").

Defs.' Mot. for Sum. J., Ex. 12 (Adams Report) at ¶ 17 (emphasis added). The objectives of the three limited partnership defendants in this case were no different: to acquire controlling interest in companies and actively manage that investment. Defs.' Mot. for Sum. J., Exs. 1–3 (Investment Guidelines, Annex B to PEP LP Agrs.) at 1; *see also* Pls.' Mot. for Sum. J., Ex. 4 (Reymond dep.) at 199–200; Pls.' Mot. for Sum. J., Ex. 6 (Dargatz dep.) at 41 (characterizing the defendants' approach to Portfolio Companies as "hands-on operating and financial approach" and stating that Palladium LPs' objective was "to bring financial expertise to these [troubled] companies" and "to bring resources to bear in finance and operations"). This strategy is far from passive investment discussed in the tax cases. Imposing the burdens of controlled group liability in this instance would be reasonable and consistent with remedial purpose of ERISA.

Of course, the opposite inference could be drawn from the facts as well. Therefore, neither side can prevail as a matter of law on this issue at this stage of the proceedings.

### B. *Alter ego* theory

The plaintiffs also argue that the defendants were the *alter ego* of the Haden companies and should be liable for withdrawal liability under that theory. Alternatively, the plaintiffs urge the Court to treat the defendants as a single employer. The defendants seek a judgment as a matter of law dismissing those claims.

#### 1. *Alter ego*

■ "The alter ego doctrine was developed to prevent employers from evading obligations under the [MPPAA] merely by changing or altering their corporate form." *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir.1986). The *alter ego* theory is fundamentally different from the controlled group theory because "[a]n *alter ego's* liability is the same as the liability of the alleged corporation ... [and] a controlled group member is jointly and severally liable only if it is a party to the action and the plaintiff obtains a judgment against it." *Cent. States, Se. & Sw. Areas Pension Fund v. Mississippi Warehouse Corp.*, 853 F.Supp. 1053, 1059 (N.D.Ill. 1994). The theory has been extended to the MPPAA context. *Brown v. Astro Holdings, Inc.*, 385 F.Supp.2d 519, 531 (E.D.Pa.2005).

■ In the labor law context, courts have employed the so-called "relaxed" version of the alter ego test, which requires a showing that "the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership," *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir.1981), and which is applied in "a more relaxed, less exacting fashion than would be required under federal common law principles," *NLRB v. Fullerton Transfer &*
*Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir.1990). Under the relaxed version of the test, the plaintiff is relieved of the obligation to show intent to avoid labor obligations. *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587–88 (6th Cir.2006).

The relaxed version of the *alter ego* test applies in two situations:

> The alter ego doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is "merely a disguised continuance of the old employer." *Southport Petroleum, Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942); *see also Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel and Restaurant Employees, and Bartenders Int'l Union*, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Increasingly, the term also is applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form.

*Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d at 336 (footnote omitted).

■ In both of these situations, the company sought to be held liable must be engaged in the same line of business as the company originally liable under labor law. *See Fullerton Transfer*, 910 F.2d at 337 & 336 n. 7 (explaining that double-breasted operations arise "where a company operating with a unionized work force establishes a second, nonunionized company *performing the same work in the same market under the same control*") (emphasis added). The relaxed standard is not applicable where the two entities "are, respectively, a corporation engaged in a different business and stockholders and officers of another corporation." *Id.* at 337. This is so

because, unlike in the situation where employers are able to thwart union obligations by merely changing a corporate form, in which case "intent can too easily be disguised," the application of the relaxed standard is not justified where the businesses are separated into multiple corporations from the get-go, before facing any pension liability repercussions. *Ibid.*

Under regular iteration of the test, " 'an intent to evade' preexisting obligations is 'clearly the focus of the alter ego doctrine.' " *Trustees of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 248 (6th Cir.2005) (quoting *Cement Masons' Pension Trust Fund v. O'Reilly*, 664 F.Supp. 277, 279 (E.D.Mich.1987)). *But see Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 319 (6th Cir.2009) (recognizing limited application of the *Resilient Floor* holding and insisting that this quotation referred to the purpose of the *alter ego* doctrine rather than its formulation). Still, no factor of the test is controlling and all relevant factors must be considered together. *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d at 581–82.

In deciding whether corporate formalities can be disregarded, the *Fullerton Transfer* court considered the following three factors: " 'the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators.' " *Fullerton Transfer*, 910 F.2d at 340 (quoting *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir.1979)). The court instructed: "When fraud is shown, we do not believe that it is always necessary to show the other two factors. Similarly, if both injustice and little respect for the corporate entity are shown, we do not believe it necessary to show fraud. Where

extraordinary injustice is shown, it may alone be a sufficient predicate to liability." *Ibid.*

The defendants in this case argue that the standard test should apply, whereas the plaintiffs advocate for the relaxed test.

### 2. Single-employer doctrine

▮▮▮ The single-employer doctrine permits courts to aggregate several smaller private entities for purposes of determining whether they constitute "employer" within the meaning of federal employment discrimination statutes. *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir.1997). Under the doctrine, when there is "sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer," courts may view subsidiary's conduct as that of both subsidiary and a parent. *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir.1983), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). Courts must consider "the degree of (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Armbruster*, 711 F.2d at 1337 (citations and footnote omitted). No single factor is conclusive, and all four factors need not be present. *Ibid.*

This "integrated enterprise" test for the presence of a single employer represents a "sort of labor-specific veil-piercing test, first developed by the National Labor Relations Board." *Pearson v. Component Technology Corp.*, 247 F.3d 471, 485 (3d Cir.2001). Although extended to several employment discrimination statutes, the test has not been applied in the contexts other than to meet the jurisdictional pre-

requisites of such statutes. *Ibid.*; *see also* Stephen F. Befort, *Labor Law and the Double–Breasted Employer: A Critique of the Single Employer and Alter Ego Doctrines and a Proposed Reformulation,* 1987 Wis. L. Rev. 67, 75 (1987).

\* \* \* \* \* \*

■ Genuine issue of material fact on the issue of *alter ego* liability under the standard *alter ego* liability test as set forth in *Fullerton Transfer* preclude summary judgment on those counts. At this point, it is unclear how much "respect" the three Palladium LPs paid to Haden's independence, how much "injustice" would be visited upon the litigants through denial of the *alter ego* liability, and how much the three defendant LPs influenced and controlled the HIG business. Although this theory of liability is weak due to equivocal evidence on the extent to which the defendants' interference with Haden's business rose to the level justifying imposition of *alter ego* liability, the record before the Court contains *some* testimony that the Palladium entities took it upon themselves to contact Haden's clients directly, to fire some percentage of Haden's work force, to force Haden to seek Palladium's approval for bids and all capital expenditures, and were generally intimately involved in the operation of Haden. *See, e.g.,* Pls.' Mot. for Sum. J., Ex. 4 (Reymond dep.) at 199–200; Pls.' Mot. for Sum. J., Ex. 6 (Dargatz dep.) at 41. At the summary judgment stage of the litigation, these facts are sufficient to preclude disposition of the *alter ego* issues as a matter of law.

### IV. Building and construction industry defense

The defendants also assert they were entirely exempt from withdrawal liability by virtue of the "building and construction industry" exemption, 29 U.S.C. § 1383(b), and that they established applicability of this exemption as a matter of law. They argue that the National Fund has admitted that more than 85% of the Haden Corporations' employees were engaged in construction work over the five-year period preceding the assessment, as would be required to trigger the exemption, and therefore, the defendants seek dismissal of the National Fund's claims stated in counts I and II of the amended complaint. The defendants alternatively ask for the opportunity to arbitrate the issue. The plaintiffs argue that the defendants have waived that defense by failing to demand arbitration within 60 days of receiving notice of the assessment of withdrawal liability as required by 29 U.S.C. § 1401(a)(1)(A)-(B).

Under the MPPAA, multiemployer pension plans can assess proportional liability on withdrawing employers for the unfunded vested benefit obligations of their plans. Ordinarily, a plan assesses such liability when an employer terminates its obligation to contribute or ceases all operations covered by the plan. 29 U.S.C. § 1383(a). However, "in enacting the MPPAA Congress recognized the transitory nature of contracts and employment in the building and construction industry with a specific exception" that defined an event triggering withdrawal liability for employers within that industry differently. *Carpenters Pension Trust Fund for N. Cal. v. Underground Constr. Co.,* 31 F.3d 776, 778 (9th Cir.1994). Under the building and construction industry exemption, withdrawal for the purposes of the MPPAA withdrawal liability provisions occurs when two conditions are met:

(A) an employer ceases to have an obligation to contribute under the plan, and

(B) the employer—

(i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which

contributions were previously required, or

(ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2). Therefore, withdrawal depends on whether an employer continues to engage in the covered activity. When the employer covered by this exemption does not continue in the industry, withdrawal liability never occurs. Under the facts in this case, since the Haden companies dissolved, and the Palladium entities never continued the business thereafter, this exception could be a complete defense to the plaintiffs' claims, if it applies.

To qualify for the construction industry exception, an employer must meet the following conditions:

· (A) substantially all the employees with respect to whom the employer has an obligation to contribute under the plan [must] perform work in the building and construction industry, and

(B) the plan—

(i) [must] primarily cover[ ] employees in the building and construction industry, or

(ii) [must be] amended to provide that this subsection applies to employers described in this paragraph.

29 U.S.C. § 1383(b)(1). ERISA does not define the term "substantially all the employees" in subsection (b)(1)(A) of section 4203, 29 U.S.C. § 1383, nor has the Sixth Circuit spoken on that point. However, the Seventh Circuit has defined the phrase to mean 85% or more. *See Cent. States, SE & SW Areas Pension Fund v. Robinson Cartage Co.,* 55 F.3d 1318, 1321 (7th Cir.1995). The term "building and construction industry" must be construed narrowly; work or significant involvement of the employees on the construction site (as opposed to abstract relationship to the construction industry) is a *sine qua non* to the exception's applicability. *Union Asphalts & Roadoils, Inc. v. MO–KAN Teamsters Pension Fund,* 857 F.2d 1230, 1234–35 (8th Cir.1988) (cataloguing cases that hold that employers who manufacture construction materials but do not install them at the construction site are not in the building and construction industry). The record contains factual disputes on all these points.

More fundamentally, however, the MPPAA requires that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of [title 29] ... be resolved through arbitration." 29 U.S.C. § 1401(a)(1). As in many other areas, in withdrawal liability actions under ERISA "arbitration reigns supreme." *Mason & Dixon,* 852 F.2d at 164; *see also Trustees of Sheet Metal Workers' Local Union No. 80 Pension Trust Fund v. W.G. Heating & Cooling,* 555 F.Supp.2d 838, 853 (E.D.Mich.2008).

Notably, the *main* issue before the Court—whether the Palladium defendants are an "employer" under 29 U.S.C. § 1301(b)(1)—falls within one of the three exceptions to the arbitration requirement under the MPPAA outlined in *Mason & Dixon,* 852 F.2d at 165–68, and none of the parties disputes that *that* issue is properly before the Court.

The issue of the applicability of the building and construction industry exception is another matter. The district courts that have addressed the subject, albeit in unpublished decisions, all hold that this defense is subject to MPPAA's mandatory arbitration requirement. *See Trustees of Laborers' Local 310 Pension Fund v. Able Contracting Group, Inc.,* No. 06–1925, 2007 WL 2238361, at *7 (N.D.Ohio Aug. 1,

2007) (concluding that applicability of the building and construction industry exception is subject to arbitration); *Trucking Employees of North Jersey Welfare Fund, Inc. v. Parsippany Constr. Co.*, No. 08–2763, 2009 WL 1076201, at *2–3 (D.N.J. Apr. 21, 2009) (requiring an employer to arbitrate whether the case falls within the building and construction industry exception); *Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. New Star/ Culp LC*, No. 07–699, 2009 WL 321573, at *5 (D.Utah Feb. 9, 2009) (stating that applicability of the exception must have been arbitrated because "an arbitrator skilled in pension and labor matters would have had superior expertise to offer ... [a]nd this court would have undoubtedly benefitted from a thoroughly developed factual record"). This Court agrees.

The MPPAA establishes strict time frames for demanding arbitration. 29 U.S.C. § 1401(a)(1)(A)-(B). They have not been met in this case. Normally, the employer's failure to submit its dispute to arbitration results in a waiver of any defenses to the imposition of withdrawal liability. 29 U.S.C. § 1401(b)(1). However, because arbitration is conceptualized as an exhaustion requirement, not a jurisdictional prerequisite, *Mason & Dixon*, 852 F.2d at 163; *Cent. States, Se. & Sw. Areas Pension Fund v. 888 Corp.*, 813 F.2d 760, 764 (6th Cir.1987), courts can equitably toll the deadline for initiating arbitration. *See Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir. 1990); *Banner Indus. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir.1989).

For the purposes of the present motion, the Court need not determine if the arbitration deadline should be extended or whether the defendants have waived the defense. If the Court determines that the defendants are employers subject to withdrawal liability under the MPPAA, the parties may have an opportunity to present evidence on the question of equitable tolling. At that time, if the Court decides that equitable tolling applies, the matter can be referred to an arbitrator. If not, then the defense will be deemed waived. In either event, the defendants have not established that they qualify for that defense as a matter of law.

## V. Conclusion

The Court finds that the facts in this detailed record present questions that cannot be resolved at the summary judgment stage under Rule 56. Therefore, a trial will be necessary.

Accordingly, it is **ORDERED** that the defendants' and the plaintiffs' motions for summary judgment [dkt. # s 89, 90] are **DENIED.**

It is further **ORDERED** that counsel for the parties appear before the Court for a status conference to discuss further case management dates on **August 23, 2010 at 4:30 p.m.**