**NEW JERSEY CARPENTERS PENSION FUND and the Trustees Thereof, Plaintiff,**

v.

**HOUSING AUTHORITY AND URBAN REDEVELOPMENT AGENCY OF THE CITY OF ATLANTIC CITY, et al., Defendants.**

Civil Action No. 12–2229 (JBS/AMD).

United States District Court,
D. New Jersey.

Signed Dec. 17, 2014.

Seth Ptasiewicz, Esq., Kroll, Heineman Carton LLC, Metro Corporate Campus I, Iselin, N.J., for Plaintiff.

Susan E. Volkert, Esq., George Gabriel Frino, Esq., Decotiis, Fitzpatrick & Cole, LLP, Teaneck, N.J., for Defendants.

**OPINION**

SIMANDLE, Chief Judge.

*Contents*

I. INTRODUCTION ...............................................547

II. BACKGROUND ...............................................549
 A. Rule 56.1 Statements ...............................................549
 B. Factual Background ...............................................549
 1. Governance Structure of ACHA and ACIC...............................................550
 2. 1994 ACHA Agreement with Local 1578 ...............................................550
 3. Demand for Payment of Withdrawal Liability ...............................................551
 C. Procedural History ...............................................551
 D. Parties' Arguments ...............................................552
 1. The Pension Fund's Motion for Summary Judgment ...............................................552
 2. Defendants' Opposition and Cross–Motion ...............................................552

III. STANDARD OF REVIEW ...............................................552

IV. DISCUSSION ...............................................553
 A. Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 ...............................................553
 1. Defendants have Waived their Defense of "Illegality" or "Ultra Vires" ...............................................554
 2. ACHA and ACIC Constitute Statutory Employers under the MPPAA ...............................................557
 3. The 1994 Agreement Establishes an Obligation to Contribute ...............................................563

V. CONCLUSION ...............................................564

## I. INTRODUCTION

Plaintiff, the New Jersey Carpenters Pension Fund and the Trustees thereof (hereinafter, the "Pension Fund" or "Fund"), initiated this ERISA action in order to recover unpaid withdrawal liability purportedly due the Fund as a result of Defendants Atlantic City Housing Authority's (hereinafter, "ACHA" or the "Housing Authority") and the Atlantic City Improvement Corporation, Inc.'s (hereinafter, "ACIC" and, together with ACHA, "De-

fendants") termination of Local Union 1578, Carpenters District Council of South Jersey, United Brotherhood of Carpenters and Joiners of America (hereinafter, "Local 1578")—a carpenters union comprised of Fund participants and beneficiaries. The Pension Fund specifically alleges in its Complaint that ACIC's termination of Local 1578's members effectuated a complete withdrawal from the Pension Fund, as defined under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1405 (hereinafter, the "MPPAA"), to the Employee Retirement Income Security Program, 29 U.S.C. §§ 1001–1461 (hereinafter, "ERISA"), therefore triggering withdrawal liability in the amount of $517,460. The Pension Fund further alleges that the obligation for the unpaid liability runs to ACHA, particularly because Defendants operate under common control and otherwise demonstrate substantial overlap in governance.

Defendants assert, in response, that they do not constitute statutory employers for the purposes of withdrawal liability, and further argue that no agreement obligates Defendants to make pension benefit contributions. Rather, Defendants assert that a one-page agreement, executed in 1994, governs the prior employment relationship between the parties, but nowhere references pension contributions, nor demonstrates the parties' intention that such relationship be governed by the withdrawal liability provisions of the MPPAA. Defendants also claim that under New Jersey law they are incapable of entering into such a labor agreement and are immune from liability for doing so.

The parties now cross-move for summary judgment, alleging diametrically opposed positions: with the Pension Fund arguing that the "overwhelming and undisputed" evidence demonstrates that both the ACHA and ACIC constitute employers for purposes of assessing withdrawal liability under the federal mandate of the MPPAA, and that the record further reflects that Defendants agreed to remit-and, in fact, remitted contributions to the Pension Fund; and with Defendants asserting that the undisputed record demonstrates that Defendants possess no such contractual obligation, and that neither entity-under any set of circumstances-qualifies as an employer under ERISA. [Docket Items 138 & 142.]

The parties do not, however, dispute that a written agreement, providing for the employment of Local 1578 carpenters and for the payment of fringe benefits, governed the parties' relationship. Nor do the parties dispute that the ACHA remitted periodic sums to the Fund throughout ACIC s employment of Local 1578's carpenters. Rather, the parties dispute the nature and effect of such agreement and, relatedly, challenge whether Defendants' conduct suffices to render them liable as "employers" under the MPPAA.

Consequently, the issues before the Court are whether ACHA and ACIC constitute employers subject to withdrawal liability, as contemplated by the MPPAA, 29 U.S.C. § 1381, and whether, if so, an agreement existed by and between the parties sufficient to trigger Defendants' liability for a withdrawal penalty associated with ACIC's termination of Local 1578's employment.[1] For the reasons that follow, the Court will grant in part the Fund's motion for summary judgment as stated

---

1. The Court heard oral argument on the pending motions on December 3, 2014, at which time the Court permitted the parties to file brief supplemental submissions concerning the Court of Appeals for the Seventh Circuit's recent decision in *Russ v. South Water Market, Inc.,* 769 F.3d 556 (7th Cir.2014), *reh'g denied* (Nov. 5, 2014). The parties' submissions followed. [Docket Items 55 & 56.]

below, and will deny Defendants' motion for summary judgment in its entirety, entering judgment for Plaintiff.[2]

## II. BACKGROUND

### A. Rule 56.1 Statements

Plaintiff accompanied its summary judgment motion with a statement of material facts not in disputed as required by L. Civ. R. 56.1(a). (Pl.'s SMF [Docket Item 38–2].) Defendants failed to furnish a response to the statement of undisputed material facts in connection with the Fund's motion for summary judgment. Rather, Defendants filed a ten-paragraph statement of undisputed materials facts-to which the Fund furnished a response-in connection with Defendants' cross-motion for summary judgment. (Defs.' SMF [Docket Item 42–5].) Defendants' statement, however, substantially fails to respond to the Fund's statement and to provide detailed citations to affidavits and/or other documents in the record in order to substantiate the statement's factual basis. (*Id.*)

In addition, much of Defendants' statement concerns the legal relevancy of such facts, the inclusion of which the Court finds inappropriate in connection with a Rule 56.1 statement. *See* L. Civ. R. 56.1(a) ("Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law."). Defendants' submission will therefore be disregarded to the extent it states legal arguments or conclusions of law, and to the extent Defendants failed to make clear any dispute with respect to the material facts set forth in the Fund's statement. Rather, the Court will deem any such fact undisputed for purposes of the pending motion. *See* L. CIV. R. 56.1(a) ("[A]ny material fact not

disputed shall be deemed undisputed for purposes of the summary judgment motion."). Consequently, though the Court will not ignore counter-stated facts that are readily apparent from Defendants' submissions, the Court need not comb the record in search of disputed facts that should have been part of Defendants' response to the Fund's Rule 56.1 statement. That is the duty of a party opposing summary judgment. Indeed, where, as in this case, a party fails to respond to the movant's statement of undisputed material facts with a point-by-point indication whether the stated fact is undisputed or, if disputed, with a citation to the factual record where contrary evidence exists, and where no contrary fact is readily apparent in the opponent's evidence, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion.

### B. Factual Background

The Pension Fund constitutes a multi-employer benefit plan governed by ERISA, 29 U.S.C. §§ 1002(3), 1301(a)(3), and the Trustees thereof act as fiduciaries on behalf of the Fund and its participants and beneficiaries. (Pl.'s SMF at ¶¶ 1–2.) ACHA, a "body corporate and politic statutorily created by the City of Atlantic City" and funded by the United States Department of Housing and Urban Development, owns and operates low incoming housing facilities in the City of Atlantic City. (Defs.' SMF at ¶ 1; Pl.'s SMF at ¶¶ 3, 8; Pl.'s Resp. SMF at ¶ 1.) ACHA maintains its office and principal place of business at 227 North Vermont Avenue, Atlantic City, New Jersey 08404. (Pl.'s SMF at ¶ 2; Defs.' Answer & Countercl. at

---

**2.** The Court exercises subject matter jurisdiction over the Fund's ERISA claims pursuant to 28 U.S.C. § 1331.

¶ 2.) ACIC, a non-profit corporation formed for the purposes of employing union members and apprentices on ACHA's behalf, maintains its office and principal place of business in the same facility. (Pl.'s SMF at ¶ 3; Def.'s SMF at ¶¶ 2, 7; Defs.' Answer & Countercl. at ¶ 1.)

### 1. Governance Structure of ACHA and ACIC

During the relevant period, ACIC operated at the behest of and out of the same office as ACHA, in order to assist in the fulfillment of ACHA's public purpose and, principally, in order to form an apprentice training program. (Pl.'s SMF at ¶ 46.) Indeed, ACIC's Amended and Restated Bylaws filed January 27, 2005 conferred on ACHA broad authority over ACIC's day-to-day operations, including: the right to appoint ACIC's entire five (5) member Board of Trustees; the right to remove any ACIC Trustee "without assignment" of cause; and the authority to veto "[a]ny action" taken by ACIC's Board, "which in the opinion of [ ] ACHA violates the principles and purposes of [ACHA] or detrimentally impacts" its operations. (Ptasiewicz Cert., Ex. H at 1, 3.) In addition, the governing bodies of both entities overlapped to a substantial degree during the relevant period, with various individuals serving on the Boards of both entities, and with the Executive Director of ACHA "[t]raditionally" also serving as the Secretary of ACIC. (*Id.* at Ex. G at 18:25–20:14, 56:12–16.)

### 2. 1994 ACHA Agreement with Local 1578

On August 26, 1994, then-Executive Director of the ACHA, John J. McAvaddy, entered into a one-page agreement with Local 1578 (hereinafter, the "agreement"), which provided:

1. The Housing Authority intends to hire workers directly from Local Union 1578 to complete work associated with the repair and renovation of units owned and/or managed by the Housing Authority. The scope of work shall cover all phases of the carpentry craft previously awarded to Local Union 1578, including lead paint abatement and asbestos abatement.

2. The Housing Authority agrees to pay the current Wage Rates and all the fringe benefits set forth in the Agreement, including any increases that are currently being negotiated which may be agreed upon during the term of this Agreement.

3. The Union agrees that the members hired by the Housing Authority will sign a stipulation that they do not wish to participate in the health and welfare plan currently providing coverage to Housing Authority employees, to wit: the New Jersey State Health Benefits Plan.

(Pl.'s SMF at ¶ 9; Ptasiewicz Cert., Ex. L [Docket Item 38–4]; Defs.' SMF at ¶ 3.) In accordance with the agreement, from "about 1996 to February 25, 2011," ACIC operated "a carpentry apprentice" program in which ACIC hired Local 1578 members "to perform carpentry tasks." (Ptasiewicz Cert., Ex. G at 48:14–22; Pl.'s SMF at ¶¶ 10–11 (citing Defs.' Answer & Counterclaim at ¶¶ 9–10).)

Though ACIC issued the paychecks, ACHA directly supervised the union carpenters, prescribed the terms and conditions of the "Local 1578 members 'employed' by the" ACIC, and directed the employees to complete projects on behalf of both entities. (Pl.'s SMF at ¶¶ 14; Defs.' SMF at ¶ 8; Ptasiewicz Cert., Ex. W at 10:8–14.) Indeed, Ira Fornorow, ACHA's Acting Director of Redevelopment and the ACHA employee formerly responsible for the "maintenance of the ACIC," oversaw and assigned the union employees, maintained their pay sheets,

time, and other payroll information, and "deal[t]" with "any issues" that arose in the course of such activity. (Ptasiewicz Cert., Ex. W at 8:3–12, 15:10–17.) Local 1578 further provided members' salary information directly to ACHA for payroll purposes. (Defs.' SMF at ¶ 9; Ptasiewicz Cert., Ex. G at 87:15–88:14 (noting that "the carpenters union" transmitted wage and benefit rate statements directly to the ACHA accounting department).) ACHA, accordingly, provided the funds necessary for the Local 1578 employees' biweekly pay checks, and reimbursed ACIC for all other expenses and costs incurred in connection with their employment (Defs.' SMF at ¶ 8), including, "checks, forms, envelopes, postage, telephone, liability and workers' compensation insurance," and certain taxes. (Ptasiewicz Cert., Ex. R.) ACHA also remitted "payment[s] reflecting" fringe benefit contributions due to the Pension Fund on behalf of the Local 1578 employees, and resolved, on occasion, "discrepancies" that arose concerning the amount of the contribution owed to the Fund. (Pl.'s SMF at ¶ 16; Ptasiewicz Cert., Exs. M (setting forth payments from ACHA to the Pension Fund), U (enclosing by letter from ACHA to the Fund a check in the amount of $26,117.50).)

On February 15, 2011, however, ACIC issued termination notices to all Local 1578 carpentry employees, purportedly on the basis of " 'budgetary constraints.' " (Pl.'s SMF at ¶¶ 19–20; Defs.' SMF at ¶ 10.) ACHA thereafter issued an "Invitation for Bids for 'On–Call Carpentry Repairs/Services[,]' " and ultimately accepted the bid from Althea Property Services, LLC, an entity that "neither employs Local 1578 employees" nor contributes to the Fund. (Pl.'s SMF at ¶¶ 21–22.)

### 3. Demand for Payment of Withdrawal Liability

As a result of Defendants' " 'complete[ ] withdrawal' " from the Fund, on July 27, 2011, the Fund prepared a payment schedule, and demanded payment of withdrawal liability in the amount of $517,460, payable in seventeen (17) quarterly payments of $33,278.75. (Ptasiewicz Cert., Ex. A.) ACHA, by various written correspondence, disputed its obligation to remit any such payment on the basis that the Local 1578 members acted as employees of ACIC, not ACHA. (*See id.* at Exs. B, D.) By letter dated March 22, 2012, however, ACHA indicated that it intended to initiate arbitration pursuant to 29 U.S.C. § 1401(a)(1)(A), notwithstanding its continuing challenge to its identification as an employer under the applicable provisions of ERISA. (Ptasiewicz Cert., Ex. F.) During the pendency of this litigation, however, the parties entered into a written agreement to stay the arbitration until conclusion of this action. (Pl.'s SMF at ¶ 25; Defs.' SMF at ¶ 26.)

### C. Procedural History

Because Defendants purportedly "failed and refused" to pay the incurred withdrawal liability, the Fund filed the two-count Complaint in this action on April 13, 2012, seeking the entry of judgment against Defendants in the amount of the withdrawal liability, plus liquidated damages, interest, and attorneys' fees and costs. (*See* Compl. at ¶¶ 31–48.) On June 29, 2012, Defendants answered the Fund's Complaint, accompanied by their own assertion of counterclaims. In the counterclaims, Defendants assert that Defendants never executed any agreement with Local 1578 (whether in the form of a collective bargaining agreement or otherwise), nor possessed any other obligation to make contributions to the Fund. (Answer & Countercl. [Docket Items 8 & 9], 6–11.) Defendants accordingly seek declarations finding Defendants not liable for any withdrawal penalty, in addition to an award of attorneys' fees and costs. (*Id.*) The par-

ties progressed through the pretrial discovery, and the pending motions followed.

### D. Parties' Arguments
#### 1. The Pension Fund's Motion for Summary Judgment

The Fund argues in its motion for summary judgment that an obligation to contribute to a pension fund under ERISA need not be solely memorialized in a formal collective bargaining agreement. (Defs.' Br. at 11.) Rather, the Fund contends that such obligation need only be evidenced by "some type of writing[.]" (*Id.*) The Fund accordingly argues that the 1994 agreement clearly constitutes Defendants' "binding promise" to remit contributions to the Pension Fund "for work performed by Union Carpenters on their behalf." (*Id.* at 18.) In support of this assertion, the Fund points to Defendants' continued contributions to the Fund, coupled with the testimony of Defendants' various former and current employees concerning the purportedly indisputable nature of the parties' agreement. (*Id.* at 17–18.)

Relying upon the liberal construction afforded remedial statutes, like ERISA, the Fund relatedly asserts that the ACHA constitutes an employer for the purposes of withdrawal liability "based on either a common control or alter ego liability theory." (*Id.* at 18–19.) In so asserting, the Fund acknowledges that ACIC technically employed the Local 1578 carpenters in accordance with the Agreement, but asserts that the undisputed facts demonstrate that "ACHA controlled the purse strings and the day to day job performance and duties of the ACIC Union Carpenters," (*id.* at 19, 37), and thus was an employer under federal law.

#### 2. Defendants' Opposition and Cross–Motion [3]

Defendants counter in opposition, and by way of cross-motion for summary judgment, that no permissible construction of the MPPAA permits a governmental entity, like ACHA, to be deemed an employer for the purposes of withdrawal liability, particularly because such entities do not exist for the purposes of conducting business, nor operate for profit. (Defs.' Cross–Mot. at 15–16, 18.) Indeed, counsel for Defendants asserted on the record on December 3, 2014 that the ACHA could never have become an employer of the Local 1578 members, for doing so would have directly contravened New Jersey State Civil Service Laws. In that regard, Defendants argue that the 1994 Agreement arose from the "totally illegal" and *ultra vires* acts of both entities, thereby rendering such Agreement unenforceable. (Defs.' Supp. Br. [Docket Item 56].)

Defendants further assert that the undisputed record in this action fails to reflect the existence of a collective bargaining agreement conferring on Defendants a contractual obligation to make pension contributions to the Fund. (Defs.' Cross–Mot. at 23–24.) In so contending, Defendants concede that Defendants' personnel "responded to requests for monies from the Fund and issued [contribution] payments," but construe such payments as aberrant acts, committed through "sloppy bookkeeping" and without understanding that such remittances might create "federal statutory liability under the MPPAA." (Defs.' Opp'n and Reply at 21.)

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall

---

**3.** Defendants separately filed their cross-motion for summary judgment and opposition to the Fund's motion. (*See* Defs.' Br. [Docket Item 42–3]; Defs.' Opp'n [Docket Item 46].) The arguments, however, are substantively identical, and the Court has accordingly considered the arguments in unison.

grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. *Id.* In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir.2014). However, any such inferences "must flow directly from admissible evidence[,]" because " 'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.' " *Halsey,* 750 F.3d at 287 (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir.1990); citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

Moreover, "[t]he standard by which the court decides a summary judgment motion does not change when the parties file cross-motions." *United States v. Kramer*, 644 F.Supp.2d 479, 488 (D.N.J.2008). Consequently, the Court's evaluation of the pending motions remains unaltered: "the court must consider the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion." *Id.* (citation omitted).

## IV. DISCUSSION

### A. Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381

Congress enacted the "comprehensive and complex" provisions of ERISA, *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131, 135 (3d Cir. 2012), in order to protect employees' pensions rights, and to provide a uniform regulatory scheme concerning legal issues arising out of employee benefit plans. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995) (discussing purpose of ERISA and MPPAA amendments). In the MPPAA, however, Congress amended ERISA out of a concern that ERISA did not adequately protect multiemployer pension plans from " 'the adverse consequences that result' " from an individual employer's decision to terminate or withdraw their participation in a benefit plan. *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 96 (3d Cir. 2011) (quoting *SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund*, 500 F.3d 334, 336 (3d Cir.2007) (citations omitted)). The amendments therefore endeavored to prevent employers subject to obligations to contribute "from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Id.* (citation omitted).

To that end, the MPPAA created the concept of withdrawal liability, which renders an employer liable for a withdrawal penalty in the event of a qualifying withdrawal from a multiemployer pension plan. *See* 29 U.S.C. §§ 1381(a), 1391. The

MPPAA specifically holds an employer that effects a "complete" or "partial" withdrawal liable to the pension plan for its share of the plan's unfunded vested benefits allocable to the withdrawn employer.[4] *Id.* The imposition of such liability aims, in essence, to lessen the harm borne by the pension fund as a result "of the loss of the withdrawn employer's future contributions." *O'Connor v. DeBolt Transfer, Inc.,* 737 F.Supp. 1430, 1435 (W.D.Pa.1990) (internal citations omitted).[5]

Consequently, as agreed by the parties on the record on December 3, 2014, the Court must engage in a two-step inquiry. First, the Court must determine whether ACHA and ACIC constitute statutory employers under the MPPAA. Second, the Court must consider whether ACHA and ACIC " 'had an obligation to contribute' " to the pension fund. *Transpersonnel, Inc. v. Roadway Exp., Inc.,* 422 F.3d 456, 460 (7th Cir.2005) (quoting *Cent. States, Se. and Sw. Areas Pension Fund v. Central Transport, Inc.,* 85 F.3d 1282, 1287 (7th Cir.1996)). The Court will address each in turn.

### 1. Defendants have Waived their Defense of "Illegality" or "Ultra Vires"

 At the outset, however, the Court dispenses with Defendants' recent threshold position that ACHA "cannot be a statutory employer" for the purposes of MPPAA liability, because the ACHA lacks "singlehanded[ ]" authority to perform " 'an act utterly beyond the jurisdiction' " authorized to it. (Defs.' Supp. Br. at 2–3.) In that regard, Defendants argue that New Jersey's Civil Service Laws prohibit the ACHA from "being the 'employer' of employees" for a period longer than one year. (*Id.*) Defendants therefore assert that the 1994 agreement could not relinquish "the ACHA's rights to abide by the law[,]" therefore rendering the Agreement *ultra vires* or, as argued here, an "illegality." (*Id.* at 2–3, 5–6.)

The Court first notes that Defendants did not plead such defense in their Answers or Counterclaims.[6] [Docket Items 11 & 12.] Indeed, the Fund asserts that Defendants never raised such defense in any of the "pleadings, correspondence submitted to the Fund by [the Fund's] counsel

---

**4.** Under the MPPAA, "complete withdrawal" occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). In the present case, ACHA effected a complete withdrawal for MPPAA purposes.

**5.** Under the MPPAA, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 ... shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). Generally, arbitration constitutes the precondition to filing suit in district court. *See Einhorn v. Dubin Bros. Lumber Co., Inc.,* 33 F.Supp.3d 504, 509–11 (D.N.J.2014) (discussing the MPPAA's generally mandatory arbitration provisions). The parties discussed concordantly, and at great length, the Court's jurisdiction to resolve the

issue concerning whether Defendants constitute statutory employers under the MPPAA-both, of course, agreeing that the Court possesses such jurisdiction. The Court therefore only briefly notes that, the question of whether an entity qualifies as an employer under the MPPAA clearly constitutes a legal question for a district court, not an arbitrator, particularly because the MPPAA only compels arbitration between a statutory employer and the plan sponsor. *See, e.g., Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc.—Pension Fund v. Centra,* 983 F.2d 495, 501 (3d Cir.1992); *Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258, 261 (2d Cir.1990)

**6.** Prior counsel for Defendants, Gregory V. Bevelock, Esq., signed and filed Defendants' Answers and Counterclaims. [Docket Items 8 & 9.]

upon receipt by Defendants of the withdrawal liability assessment, in Defendants' initial disclosures or in any discovery provided to [the Fund] during this litigation." [Docket Item 57.]

Rather, Defendants raised this defense, for the first time, in connection with their reply brief in further support of Defendants' pending motion for summary judgment (and again on the oral argument record on December 3, 2014).[7] (*See* Defs.' Reply at 12–14, 21.) The predicate for this defense, however, rests upon facts long in the possession of Defendants, and should therefore have been presented earlier in order to be considered in connection with the pending motions. Indeed, under Federal Rule of Civil Procedure 8(c), *ultra vires*, or, as argued here, illegality,[8] constitutes an affirmative defense which Defendants waived by failing to *affirmatively* state such defense in their Answers.[9] *See* FED. R. CIV. P. 8(c)(1); *Pujals ex rel. El Rey De Los Habanos, Inc. v. Garcia*, 777 F.Supp.2d 1322, 1330–31 (S.D.Fla.2011) (construing *ultra vires* as an affirmative defense); *U.S. Chess Federation, Inc. v. Polgar*, No. 08–5126, 2009 WL 981257, at *5 (N.D.Cal.2009) (same).

However, in considering whether Defendants' failure to raise the affirmative defense effectuated a waiver, the Court must consider whether Defendants' untimely assertion caused " 'surprise or undue prejudice' " by failing to provide the Fund with " 'notice and the opportunity to demonstrate why the affirmative defense should not succeed.' " *In re Sterten*, 546 F.3d 278, 285 (3d Cir.2008) (quoting *Robinson v. Johnson*, 313 F.3d 128, 134–35 (3d Cir.2002)) (citation omitted). Counsel for the Fund makes palpable claims for both prejudice and surprise, in light of the fact that the Fund had no prior notice of this defense, nor the opportunity to conduct the discovery and legal research invariably required to prove and/or disprove such theory. [Docket Item 57.] The Court agrees. For two years these parties have litigated the claims and defenses that were raised, and never was illegality plead or even mentioned as a defense until after the principal briefs on these cross-motions for summary judgment were filed. Defendants point to no reason why the illegality defense could not have been raised in their Answers and Counterclaims long ago. The Court therefore finds such defense waived. *See, e.g., Anderson v. Thermo*

---

**7.** Counsel for Defendants also argued on the record on December 3, 2014, that sovereign immunity bars the Fund's claims. As with the illegality assertion, Defendants did not raise any sovereign immunity defense in their Answers or Counterclaims, nor have Defendants relied upon such defense in their supplemental submission. Consequently, the Court need not address the application of sovereign immunity in this instance. The Court notes, however, that Defendants' assertion of counterclaims arguably effectuated a waiver any applicable immunity.

**8.** Though *ultra vires* and illegality may, in certain circumstances, refer to distinct defenses, *see, e.g., Barfield v. Sho–Me Power Elec. Co-op.*, 10 F.Supp.3d 997, 1020 (W.D.Mo.2014), Defendants in this instance challenge both ACHA's authority to enter into

the 1994 Agreement and the legality of the Agreement itself. Consequently, for purposes of the pending motions, such terms have a synonymous meaning and, indeed, Defendants' submissions rely upon the terms interchangeably. (*See, e.g.,* Defs.' Supp. Br. at 1–4.) The Court, accordingly, construes the defenses for purposes of the pending motion as coextensive. *See Frontier Commcn's Corp. v. Barrett Paving Materials, Inc.*, No. 07–113, 2009 WL 3062322, at *6 n. 6 (D.Me. Sept. 23, 2009) (considering illegality and *ultra vires* interchangeably).

**9.** For that reason, the Court rejects counsel for Defendants' assertion that the boilerplate assertion of "failure to state a claim" necessarily includes the assertion of *ultra vires*, or illegality.

*Fisher Scientific,* No. 11–3394, 2013 WL 1222738, at *1 n. 1 (D.N.J. Mar. 25, 2013) (refusing to consider an affirmative defense raised, for the first time, in connection with the parties' summary judgment briefing); *Ingraham v. U.S.,* 808 F.2d 1075, 1079 (5th Cir.1987) ("Central to requiring the pleading of affirmative defenses is the prevention of unfair surprise. A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.").

■■ However, even if the Court, contrary to the above, found no waiver, the Court would still find that Defendants have failed to meet their burden of demonstrating the defense's application in this instance. *See Emp'rs Ins. of Wausau v. Titan Int'l, Inc.,* 400 F.3d 486, 490 (7th Cir.2005) (noting that illegality is an affirmative defense, and that "of course defendants have the burden of proving affirmative defenses"). Notably, Defendants' argument rests upon a faulty premise, namely, the notion that because the ACHA should not have employed the Local 1578 members, other than in accordance with the Civil Service Laws, that the ACHA necessarily did not do so. (Defs.' Supp. Br. [Docket Item 56].) In so arguing, however, Defendants provide no legal authority for their position that New Jersey's Civil Service Laws constrained ACHA's employment decisions. Rather, Defendants vaguely rely upon an opinion letter authored by a retired Justice of the New Jersey Supreme Court. (*See, e.g.,* Defs.' Reply at 22.) The opinion letter, however, does not constitute relevant authority of a binding or persuasive nature in connection with the pending motions.

Moreover, even if the ACHA contravened New Jersey's Civil Service Laws in executing the 1994 Agreement, such violation would not appear to render the Agreement a nullity. Rather, violations of New Jersey Civil Service Law would potentially subject ACHA to certain, primarily monetary, penalties. *See* N.J.A.C. §§ 4A:10–1.1, –2.1 (listing, in the disjunctive, the various penalties that "may" be imposed in the event an entity violates the Civil Service Laws).

For all of these reasons, the Court finds that Defendants have not demonstrated, as required under New Jersey's *ultra vires* doctrine, that the ACHA "'was utterly without capacity'" to enter into the 1994 Agreement. *Port Liberte II Condominium Ass'n, Inc. v. New Liberty Residential Urban Renewal Co., L.L.C.,* 435 N.J.Super. 51, 86 A.3d 730, 739 (N.J.Super.Ct.App.Div.2014) (citation omitted). Indeed, such actions would traditionally "enjoy a presumption of validity," *Bryant v. City of Atl. City,* 309 N.J.Super. 596, 707 A.2d 1072, 1079 (N.J.Super.Ct.App.Div.1998), and Defendants have not come forward with evidence to demonstrate any patent invalidity in this instance.[10] The Court therefore concludes that New Jersey's Civil Service Laws do not alone provide any insulation from withdrawal liability, where the definition of a statutory employer under the MPPAA depends upon federal law and not upon state civil service regulations, particularly given the broad-sweeping and remedial nature of the MPPAA. *See IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 127 (3d Cir.1986) (noting that "because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans") (citations omitted). Stated differently, the notion that state law precludes these ACIC employees from being counted as ACHA

---

10. Nor, as explained below, does the MPPAA exempt municipal agencies from the conse-

quences of obligations such agencies voluntarily undertake.

employees does not alter the question presented here of whether, under federal law, ACHA was a statutory employer for MPPAA purposes. The Court, accordingly, turns to whether Defendants constitute entities subject to withdrawal liability under the MPPAA.

### 2. ACHA and ACIC Constitute Statutory Employers under the MPPAA

In order to properly frame the issues implicated by the pending motions—namely, the parties' dispute concerning the application of concepts unique to the MPPAA, like "employer[,]" "common control[,]" and "alter ego"—the Court will briefly introduce the applicable framework.

#### a. "Employer" and "alter ego" Liability under the MPPAA

Responsibility for payment of withdrawal liability attaches in the first instance to the withdrawing employer. The MPPAA, however, "nowhere defines what constitutes an 'employer' responsible for withdrawal liability." *Brown v. Astro Holdings, Inc.*, 385 F.Supp.2d 519, 527 (E.D.Pa. 2005) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transport, Inc.*, 85 F.3d 1282, 1287 (7th Cir.1996)). Indeed, though the definitional provisions of the MPPAA defines a "substantial employer" for purposes of a single-employer plan, such provisions set forth no definition of an employer, substantial or otherwise, for purposes of a multiemployer plan, as here. 29 U.S.C. § 1301(a)(2). Nor can the Court turn to the definition of "employer" as set forth in the general definitional provisions of ERISA. 29 U.S.C. § 1002(5). Indeed, such provisions have expressly limited application to Title I of ERISA and do not otherwise apply to the MPPAA, set forth in Title IV of ERISA. *See Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 212 (4th Cir.2000) (finding the definition of "employer" in Title I inapplicable to the definition of "employer" in Title IV);

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 370–71, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (cautioning that the definitions in Title I are "not necessarily applicable to Title IV"). Rather, the "final analysis" concerning who constitutes an employer subject to withdrawal liability under the MPPAA "must be left to the courts." *Korea Shipping Corp. v. N.Y. Shipping Ass'n–Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1536 (2d Cir.1989) (citation omitted).

"The United States Court of Appeals for the Third Circuit has not yet addressed how, in the absence of a statutory definition, a court should define an 'employer' under the MPPAA." *Brown*, 385 F.Supp.2d at 527; *see also Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.*, No. 02–7825, 2011 WL 1135944, at *12 (E.D.Pa. Mar. 24, 2011) (noting that, "the MPPAA contains no definition of an 'employer,' and this definition has instead been 'left to the courts.'") (citation omitted). The seven appellate courts that have addressed such definition, however, have all adopted the definition established by the Court of Appeals for the Second Circuit in *Korea Shipping Corporation v. New York Shipping Association–International Longshoremen's Association Pension Trust Fund*, 880 F.2d 1531, 1536 (2d Cir.1989). *Brown*, 385 F.Supp.2d at 528 (collecting cases concerning the appellate courts that have followed *Korea Shipping*).

In *Korea Shipping*, the Second Circuit considered, in consolidated appeals, whether two steamship carriers-neither of which directly employed their own labor force-nevertheless qualified as employers under the MPPAA of the longshoremen who loaded and/or discharged their cargo at port. 880 F.2d at 1534. Two collective bargaining agreements governed operations at the port: one being "the so-called

'master agreement,' " which set forth "uniform terms applicable to ports in which the" International Longshoremen's Association functioned and specifically included pension contributions and "the payment of 'job security program assessments' " in order to offset shortfalls in contributions to longshoremen pension funds; and the other being the general cargo agreement, which governed the terms and conditions specific to the Port of New York, including "pension benefits, seniority, hiring, safety, and holidays." *Id.* The steamship carriers executed both agreements and, prior to the cessation of their operations, "regularly complied with their [pension] assessment obligations" under the various agreements. *Id.* The carriers, however, resisted the pension fund's efforts to assess withdrawal liability, arguing that the stevedoring companies, the direct employers of the longshoremen, bore sole responsibility for any withdrawal liability. *Id.* at 1535.

In rejecting such argument, the district court found no reasoned basis to absolve a pension . contributing indirect employer from withdrawal liability, solely because of the absence of any direct employment relationship. *Id.* On appeal, the Court of Appeals for the Second Circuit, after surveying "remedial and protective purposes" articulated by Congress in the MPPAA's enactment, agreed and concluded that "employer" under the MPPAA included any person or entity "obligated to contribute to a [pension] plan either as a direct employer or in the interest of an employer of the plan's participants." *Id.* at 1537.

■ As stated above, most courts that subsequently considered the issue "have followed the lead" of *Korea Shipping* in evaluating the applicable contours of an "employer" under the MPPAA. *Gov't Dev. Bank for P.R.*, 2011 WL 1135944, at *12 n. 21 (citation omitted). Certain courts, however, have relatedly extended the definition of "employer" under the MPPAA to include such entities' "alter egos." *See, e.g., id.* at *12 (summarizing the court's prior ruling in *Brown* concerning an alter ego theory of liability under the MPPAA). In so extending, at least one court persuasively concluded that an alter ego theory of liability "would not" result in the undue expansion of withdrawal liability, because such claims rested upon allegations that the alter ego acted as " 'essentially the same entity' as the employer" liable for withdrawal liability under 29 U.S.C. § 1381(a). *Id.* The Court agrees, and finds attachment of withdrawal liability to an alter ego consistent with the fundamental policy and purpose of the MPPAA, namely, to prevent employers from strategically shifting assets in order to avoid an employer's MPPAA liability. *See id.; see also Brown*, 385 F.Supp.2d at 531–32 (finding that, "that the MPPAA permits a plaintiff to bring a claim for alter ego liability alleging that a defendant is the alter ego of the statutory employer"); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners, LLC*, 722 F.Supp.2d 854, 871 (E.D.Mich.2010) (" 'The alter ego doctrine was developed to prevent employers from evading obligations under the [MPPAA] merely by changing or altering their corporate form.' ") (citation omitted).

### b. "Common Control" Liability under the MPPAA

The MPPAA, however, also extends liability beyond the withdrawing employer to "trades or businesses (whether or not incorporated) which are under common control" with the withdrawing employer. 29 U.S.C. § 1301(b)(1). The MPPAA renders such entities jointly and severally liable for any withdrawal liability. The statute, however, does not define "under common control" or "trade or business" and instead directs that such phrases be defined in a manner "consistent and coextensive with"

regulations promulgated by the Treasury Department under section 414(c) of the Internal Revenue Code (hereinafter, the "IRC"), 26 U.S.C. § 414(c). *Id.*

Defendants, in essence, concede that ACHA and ACIC are under common control, given the undisputed overlapping governing structures. Rather, Defendants dispute whether ACHA and/or ACIC, as public entities, qualify as a "trade or business" under 29 U.S.C. § 1301(b)(1). The IRC, however, does not provide a general definition for "trade or business." In interpreting "trade or business" for purposes of the IRC, the Supreme Court concluded that engagement in a "trade or business" requires regular and continual involvement in an activity, primarily for the purpose of income or profit. *Comm'r of Internal Revenue v. Groetzinger,* 480 U.S. 23, 35, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987). Courts have not, however, been inflexible in their application of the *Groetzinger* test. Rather, courts have primarily "undertaken a factual inquiry to determine whether characterizing an entity as a 'trade or business' will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations." *Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.,* 765 F.Supp.2d 710, 715 (2011) (citation omitted); *see also Brown,* 385 F.Supp.2d at 533 ("The legislative history of the common control provisions indicates that Congress enacted them 'in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities.'") (citations omitted).

### c. Application to Defendants

■ In considering the application of the various theories of "employer" liability to the pending litigation, the Court rejects Defendants' assertion that Defendants' "public entity" status exculpates them, entirely, from the confines of the MPPAA.

(*See* Defs.' Opp'n and Reply at 8, 22–25.) Specifically, though Defendants concede that neither entity " 'established or maintained' " a pension fund, as required by the governmental plan exemption, 29 U.S.C. § 1002(32), Defendants vaguely assert that the Court could conclude that, "unbeknownst" to ACHA, it "established a governmental plan" in forwarding contributions to the Fund. (*Id.* at 24.)

■■ However, it is readily apparent that, "when a state or local government body 'voluntarily accept[s] a private welfare benefit plan for its employees it cannot later complain that ERISA regulation of that plan invades its sovereignty.'" *City of Warwick v. Laborers' Int'l Union of N. Am.,* No. 08–366, 2009 WL 462690, at *4 (D.R.I. Feb. 23, 2009) (quoting *Livolsi v. City of New Castle, Pa.,* 501 F.Supp. 1146, 1150 (W.D.Pa.1980)). Moreover, though the MPPAA codifies an exemption applicable to a plan comprised solely of governmental employees, *see* 29 U.S.C. §§ 1003(b)(1), 1002(32), such exemption has no application to a pension fund in which non-governmental employees likewise participate. *Livolsi,* 501 F.Supp. at 1148 (finding a multiemployer welfare fund not exempt from the MPPAA, because the fund included private and public employers). Here, it is undisputed that both private and public employers participate in the Fund. Indeed, the litany of cases in this District involving the Fund provide unequivocal support for this conclusion. *See, e.g., N.J. Reg'l Council of Carpenters v. Chanree Constr. Co., Inc.,* No. 13–5613, 2014 WL 980649 (D.N.J. Mar. 12, 2014) (noting the Fund's inclusion of private employees); *N.J. Reg'l Council of Carpenters v. N.J. Installations, L.L.C.,* No. 11–5588, 2013 WL 2096565 (D.N.J. May 14, 2013) (same). Consequently, Defendants' status as a public entity does not, without more, squarely resolve the application of the

MPPAA in this instance. The Court therefore turns to whether genuine issues of material fact exist concerning whether Defendants constitute employers under the MPPAA for the purposes of withdrawal liability.

The parties do not dispute many of the material facts necessary to resolve such inquiry. Indeed, neither party disputes the authenticity of the parties' 1994 agreement setting forth the requirement that ACHA pay certain fringe benefits. (*See* Pl.'s Br. at 5, 17–18; Defs.' Cross–Mot. at 3, 24–25.) Nor do Defendants dispute that ACHA remitted payments to the Fund for the purposes of such benefits. (Defs.' Opp'n and Reply at 24–25 ("What is a fact, and what is not disputed is that government funds were sent [by Defendants], e.g. contributions were made to a plan maintained by another entity.").) Moreover, though Defendants assert that ACHA and ACIC cannot constitute statutory employers under the MPPAA, they concede the entities' "interlocking nature" and indeed acknowledge that ACIC's existence "totally depend[ed]" upon ACHA. (Defs.' Cross–Mot. at 6; Defs.' Opp'n and Reply at 11.) Rather, Defendants take the position that "the fundamental structures of" ACHA and ACIC, even if "under a common umbrella," fail to "create a statutory entity within the parameters of the MPPAA[,]" particularly because Defendants never intended, by executing the 1994 agreement, to become saddled with the obligations of the MPPAA. (Defs.' Opp'n and Reply at 10.)

The Court finds such argument without merit. No genuine issue of material fact exists in this instance concerning the 1994 Agreement executed by and between ACHA and Local 1578: it unequivocally obligated ACHA to pay Local 1578 members "the current wage rates and all [ ] fringe benefits" and ACHA received such carpenters' labor and made such contribu-

tions, in accordance with the agreement, for nearly seventeen (17) years. (Ptasiewicz Aff., Exs. L, M, N, O, P, Q.) The agreement, coupled with the surrounding and undisputed course of conduct, therefore provides ample indicia of ACHA's obligation to contribute to the Pension Fund.

In that regard, the Court rejects Defendants' assertion that *Seaway Port Authority of Duluth v. Duluth–Superior ILA Marine Association Restated Pension Plan,* 920 F.2d 503 (8th Cir.1990), compels any contrary result. (*See* Defs.' Cross–Mot. at 24–25.) In affirming the district court, the Eighth Circuit in *Seaway* concluded that a public entity, the Seaway Port Authority of Duluth (hereinafter, "SPAD"), did not constitute an employer for the purposes of the MPPAA, because no contractual agreement obligated SPAD to make pension contributions. *Id.* at 509. Rather, the only applicable agreement referenced the provision of funds " 'to carry on the operations' " and to meet " 'payroll expenses and related fringe benefits.' " *Id.* at 509 n. 5. The *Seaway* court found the " 'fringe benefit' " provision insufficient to establish SPAD's obligation to contribute to a pension plan because the provision "clearly" stated that the obligation to provide such benefits ran to another entity, not SPAD, and because the provision otherwise failed to mention pension contributions. *Id.*

Here, however, there is no dispute that the 1994 agreement and performance thereunder renders ACHA directly liable for fringe benefit contributions. *See also Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. Indus. Power Contractors Plant Maint. Servs.,* Nos. 09–929, 10–334, 2011 WL 6130932, at *4–*5 (D.Utah Dec. 8, 2011) (noting that making payments in accordance with an unsigned agreement may constitute a sufficient course to conduct to bind a party to contribution liability under ERISA). Moreover,

as more fully explained below, the undisputed record clearly reflects a litany of "contribution" payments from ACHA to the Fund in varying amounts and extending over a number of years, all consistent with ACHA's obligations to contribute for the carpenters' fringe benefits. (*See* Ptasiewicz Aff., Exs. M, N, O, P, Q.)

Rather, the Court follows the rationale set forth in *NYSA–ILA Pension Trust Fund v. Pouch Terminal, Inc.*, No. 89–6042, 1990 WL 55713 (S.D.N.Y. Apr. 24, 1990). In *NYSA–ILA Pension Trust*, the pension fund plaintiff moved for summary judgment, as here, on the issue of defendant's withdrawal liability. *Id.* at *1. In challenging its liability for a withdrawal penalty, defendant acknowledged the existence of an agreement requiring it to make certain payments to the pension plan, but nonetheless argued that defendant did not qualify as a statutory employer under the MPPAA, nor that it ever "intended to be obligated to [plaintiff] beyond the [remitted] payroll contributions[.]" *Id.*

Though the local agreement that governed the parties' relationship set forth terms concerning "wages, hours, vacations and pension contributions[,]" defendants took the position that, in executing such agreement, it intended to incur an obligation "solely for payroll contributions" without being correspondingly "'saddled with withdrawal liability.'" *Id.* at *4. The district court in *NYSA–ILA Pension Trust*, however, found such position in "conflict[ ] with the underlying purposes of imposing withdrawal liability: to ensure adequate funding for multiemployer pension plans when the contribution base shrinks due to employers' withdrawal." *Id.* (citation omitted). Rather, the court concluded that defendant's continued participation in the pension plan clearly "manifested the requisite intent to obligate itself for withdrawal liability[,]" particularly because defendant could have freely avoided withdrawal liability by declining to execute the local agreement. *Id.*

In this action, the Court finds that ACHA and ACIC constitute statutory employers for the purposes of the MPPAA. As stated above, it is well-established that an "employer" under the MPPAA includes any person or entity "obligated to contribute to a [pension] plan either as a direct employer or in the interest of an employer of the plan's participants." *Korea Shipping*, 880 F.2d at 1537. Here, the Court need not engage in any protracted inquiry concerning whether ACHA and ACIC constitute alter egos, nor whether such entities remain under common control. Rather, as the *signatory* of, and *true obligor* under, the 1994 agreement, ACHA clearly falls within the ambit of a statutory employer for the purposes of withdrawal liability. (Ptasiewicz Aff., Ex. L.) Moreover, the 1994 agreement provides for the payment by ACHA of "all" fringe benefits. (*Id.*) Even affording Defendants all reasonable inferences, such provision connotes a clear obligation to make pension contributions, particularly when juxtaposed with Defendants' admission that ACHA indeed remitted such sums to the Fund for more than a decade and for as long as Local 1578 provided carpenters to ACIC for ACHA's work. (*See, e.g.*, Defs.' SMF at ¶ 8; Defs.' Opp'n and Reply at 24–25.) Moreover, the undisputed documentary evidence in this litigation refutes Defendants' assertion that such transfers occurred without intention. (*See, e.g.*, Defs.' Opp'n and Reply at 20–21.) Indeed, several undisputed exhibits state that such disbursements constituted "pension fund" contributions. (Ptasiewicz Aff., Exs. P, Q, U.) Consequently, even if the 1994 agreement could, to some extent, be deemed ambiguous, Defendants' actions reflect one clear and consistent understanding: ACHA and ACIC construed the agreement, in application, as one binding Defendants to make

certain pension contributions directly to the Fund in connection with employer Local 1578 carpenters. The Court finds Defendants' arguments to the contrary unsupported, and thus insufficient to create a genuine dispute of material fact. Indeed, Defendants' position that its employees would issue payments to the Fund "without any understanding" of whether and why such monies should have been paid, and without regard to their authority to disburse same, quite simply defies reason, and lacks foundation in this record. (Defs.' Opp'n and Reply at 21 (setting forth counsel's supposition concerning the motivation of certain personnel).) Rather, the undisputed conclusion remains unchanged: Defendants consistently remitted pension contributions as a result of the obligation delineated in the 1994 agreement and regularly computed by the Fund. (*See generally* Pl.'s SMF; Defs.' SMF.)

The undisputed exhibits contained in this record further demonstrate the obligatory, rather than gratuitous, nature of such payments. Indeed, in one such exhibit, a letter advising of a delinquent pension fund contribution, the former Executive Director of the ACHA specifically directs that ACHA immediately rectify the delinquency. (Ptasiewicz Aff., Ex. D at 31 on the docket.) Shortly thereafter, the ACHA's then-Acting Director of Finance enclosed, by letter dated August 31, 2007, a $26,117.50 "payment reflect[ing] all contributions due" to the Fund, and further stated that such payment rendered Defendants' account "up-to-date[.]" (Ptasiewicz Aff., Ex. U.) The Court therefore finds that ACHA's continued participation in the Fund provides more than ample indicia of ACHA's acceptance and performance of the obligation to contribute under the MPPAA, thereby rendering ACHA an employer for MPPAA purposes. *See Cent. States, Se. & Sw. Areas Pension Fund v. Progressive Driver Servs., Inc.,* 940 F.Supp. 1311, 1315 (N.D.Ill.1996) (con-

cluding that an obligation to contribute, by itself, renders an entity an employer for MPPAA purposes). Defendants cannot operate as if fully liable and obligated to make federally-protected pension plan contributions and then disclaim such liability when confronted with the prospect of a withdrawal penalty under the MPPAA. *See Delta S.S. Lines, Inc. v. N.Y. Shipping Ass'n, Int'l Longshoremen's Ass'n Pension Trust Fund,* 688 F.Supp. 1560, 1563 (S.D.N.Y.1988) (noting that, "[i]t would frustrate the congressional purpose behind the MPPAA to hold that contributors, which are not common law employers, can never be subject to withdrawal liability"), *aff'd,* 880 F.2d 1531 (2nd Cir.1989).

Moreover, under the undisputed facts herein, it is of no consequence that ACIC, rather than ACHA, engaged the Local 1578 members, particularly because such engagement indisputably occurred under ACHA's active direction, oversight, and funding for all such labor expenses. (*See, e.g.,* Defs.' SMF at ¶¶ 7–9.) ACHA's execution of the 1994 agreement further belies any claim that the ACHA had, in essence, limited control over the Local 1578 members' employment. (Ptasiewicz Aff., Ex. L.) Rather, it is clear that the ACHA created ACIC as an instrumentality to enable ACHA to perform tasks otherwise administratively problematic for a public entity. Indeed, ACHA concedes this reality. (*See* Defs.' SMF at ¶ 7; Defs.' Cross–Mot. at 4 (asserting that ACHA "experienced problems" directly employing union members and, therefore, "decided to use ACIC to employ the union members and apprentices"). Given these circumstances, attachment of liability in this instance falls squarely within the core purpose of the MPPAA: preventing employers from strategically shifting assets and control in order to avoid withdrawal liability. *See SUPERVALU, Inc.,* 500

F.3d at 336 discussing the purposes of the MPPAA). Such a maneuver contravenes the fundamental purposes underpinning the MPPAA, and provides no relief to Defendants in this instance. The Court therefore turns to whether the 1994 Agreement established an obligation to contribute.

### 3. The 1994 Agreement Establishes an Obligation to Contribute

 The Court need only briefly address Defendants' assertion that the 1994 Agreement lacks the formalities necessary to create an obligation to contribute under the MPPAA. (*See, e.g.,* Defs.' Supp. Br. at 2–5.) Notably, though an obligation to contribute clearly arises as `a matter of contract, the Court finds Defendants' assertion that such obligation must solely be evidenced by a collective bargaining agreement unconvincing. (Defs.' Cross–Mot. at 24–25; Defs.' Supp. Br. at 4–5.)

Indeed, the MPPAA, by its very terms, provides that any obligation to contribute may arise "under one or more collective bargaining (or *related* ) agreements[.]" 29 U.S.C. § 1392(a) (emphasis added). A sufficient obligation for purposes of withdrawal liability therefore arises in the context of an array of contractual arrangements, not solely in connection with a collective bargaining agreement. *Rheem Mfr. Co. v. Cent. States Se. & Sw. Areas Pension Fund,* 63 F.3d 703, 706–07 (8th Cir.1995) (noting that an obligation to contribute may arise, *inter alia,* in "collective bargaining agreements, general cargo agreements, or shipping association agreements"). Consequently, the absence of formalities typical in the collective bargaining context does not, without more, end the inquiry before the Court. Rather, "[t]he nature of the obligation to contribute establishing an entity as an 'employer' for MPPAA purposes" is, quite simply, "contractual[.]" *Id.* at 707 (citation omitted). Here, Defendants do not dispute

that the 1994 Agreement, executed by ACHA, constitutes a contract, and otherwise exhibits the traditional contractual formalities. The 1994 agreement, as stated below, further obligated ACHA to contribute to the Fund. The 1994 Agreement therefore suffices, without more, to establish the necessary contractual obligation.

However, even if it did not, an entity may for the purposes of MPPAA liability assume a contractual obligation through a cause of conduct consistent with the existence of an agreement. *See Transpersonnel, Inc.,* 422 F.3d at 460. In that regard, the Court finds *Russ v. South Water Market, Inc.,* 769 F.3d 556 (7th Cir.2014), *reh'g denied* (Nov. 5, 2014), instructive.

In *Russ,* South Water Market and Local 703 of the Teamsters Union negotiated the terms of a new collective bargaining agreement, and "shook hands" on such agreement on September 12, 2007. *Id.* at 556. Despite the hand shake, South Water Market's bargaining representative, Michael Abramson, failed to provide a proposed written agreement as a result of " 'trouble with [his] notes.' " *Id.* In April 2008, the Union President, Howard Murdoch, therefore forwarded his notes from the negotiation, which set forth the operative terms. *Id.* South Water Market, however, did not respond, but "began paying the wages, and making the pension and welfare contributions, specified in Murdoch's text." *Id.* at 557. In July 2009, a dispute arose concerning contributions purportedly owed in accordance with the parties' agreement, with South Water Markets arguing, in essence, "that it never agreed to terms that Murdoch drafted in April 2008." *Id.*

The District Court for the Northern District of Illinois granted South Water Market's motion for summary judgment, principally on the basis that South Water Market never executed Murdoch's draft, nor conveyed assent to such draft. *Id.*

The Court of Appeals for the Seventh Circuit reversed, finding, in relevant part, that South Water Market's "performance" provided sufficient indicia of its "assent to be bound." *Id.* (citations omitted). In that regard, the *Russ* court noted that, because South Water Market put into effect the terms of the April 2008 document, it could not claim that such document acted as a proposal, or an otherwise unenforceable agreement. *Id.* at 558.

Rather, the Court found that, in the event South Water Market intended "to accept some clauses and reject others, it should have said so in April 2008." *Id.* Yet, as here, "its first protest came in response to [the pension funds'] August 2009 bills." *Id.* Indeed, the court found South Water Market's reservation, in whatever form, was conveyed "much too late" to preclude the agreement's enforcement. *Id.* Rather, because the prevailing law entitles pension and welfare funds to enforce the writings they receive, and "analogizes them to holders in due course, not to simply third-party beneficiaries whose rights can be cut off at the contracting parties' whim," the *Russ* court reversed for a calculation of the amount owed pursuant to the April 2008 agreement. *Id.*

Here, as in *Russ*,[11] the Court cannot ignore ACHA's lengthy and undisputed payment history, as stated above. In that regard, the opportunity to object to the attachment of any contribution obligations arose in the period immediately subsequent to ACHA's execution of the 1994 Agreement, not simply in response to the Fund's July 27, 2011 demand. Never in

the 17 years that the 1994 Agreement existed did ACHA or ACIC dispute that it was bound to make the pension fund contributions. For all of these reasons, the Court finds an obligation to contribute. The Court holds that Defendants ACHA and ACIC are statutory employers which are liable to pay the withdrawal penalty under the MPPAA.

## V. CONCLUSION

The Court accordingly concludes that Defendants qualify as statutory employers subject to an obligation to contribute under the MPPAA. The Court therefore grants the Fund's motion for summary judgment as to Defendants' qualification as a statutory employer, and denies Defendants' cross-motion in its entirety.

Specifically, the Court finds that ACHA and ACIC are statutory employers liable to pay a withdrawal penalty to the Pension Fund under the MPPAA arising from their agreement with Local 1578 to pay fringe benefits dated August 26, 1994, which continued until Defendants' withdrawal occurred in 2011. Further, the Court finds that Defendants' counterclaims for a declaratory judgment that Defendants are not liable for MPPAA withdrawal liability will be denied and judgment on the counterclaims will be entered in favor of the Plaintiff.

The Court makes no determination of the amount of withdrawal liability Defendants owe to the Fund. In light of the parties' assertion concerning the pendency of the arbitration proceeding, in addition to the MPPAA's clear mandate that, "[a]ny

---

**11.** The Court rejects Defendants' assertion that *Russ* is inapposite to this litigation on the basis that the disputed issues in *Russ* arose in connection with negotiations over a collective bargaining agreement. (Defs.' Supp. Br. at 5.) Rather, the Court finds *Russ* applicable to this litigation, in light of the fact that *Russ* clearly envisions an obligation to contribute arising in an array of contexts, including, as here, in connection with an undisputed course of conduct consistent with a contractual arrangement. Indeed, the present case presents an even clearer case for employer liability than *Russ,* in which the dispute about pension payments arose in the very first year of the agreement.

dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration[,]" 29 U.S.C. § 1401(a), the Court will not enter final judgment at this time. Rather, the Court shall direct the parties to arbitrate pursuant to § 1401(a) and administratively terminate this action, without prejudice, to enable the parties to proceed, as desired and/or statutorily required, to arbitration concerning any matters remaining in dispute that have not been adjudicated herein, including the amount of the withdrawal penalty.

The accompanying Order will be entered.